Lori J. Costanzo, SBN 142633
Lucy Goodnough, SBN 310607
Mallory A. Barr, SBN 317231
COSTANZO LAW FIRM
111 West St. John, #700
San Jose, CA 95113
Phone:    408.993.8493
Fax:       408.993.8496
Email:    Lori@costanzo-law.com
            lucy.goodnough@costanzo-law.com
            mallory.barr@costanzo-law.com

Attorneys for Plaintiff Sharon Barrett

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| SHARON BARRETT,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>CUSHMAN & WAKEFIELD U.S., INC., RAUL C. CAMPOS, CAMPOS REAL ESTATE ADVISORY, INC., and KENNETH J. GILBERT,<br><br>　　　　　Defendants. | Case No.:<br><br>**COMPLAINT FOR DAMAGES**<br><br>**JURY TRIAL DEMANDED** |

COSTANZO LAW FIRM
111 W. ST. JOHN, STE. 700
SAN JOSE, CA 95113

COSTANZO LAW FIRM
111 W. ST. JOHN, STE. 700
SAN JOSE, CA 95113

Plaintiff Sharon Barrett alleges against Defendants Cushman and Wakefield U.S., Inc., Raul C. Campos and Kenneth J. Gilbert (together "Defendants"), and each of them, as follows:

## I.    <u>INTRODUCTION</u>

1.    This is an action for discrimination based on age and gender in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"), the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. § 621 *et seq.* ("ADEA"), the Equal Pay Act of 1963, 29 U.S.C. §§ 206 *et seq.* ("EPA"), and related California statutory and common law claims.

2.    Plaintiff Sharon Barrett is a former Senior Vice President (SVP) of Strategic Services at Cushman & Wakefield, a publicly traded commercial real estate company with global reach.

3.    Cushman & Wakefield, US, Inc., formerly Cassidy Turley Commercial Real Estate Services, Inc. is a Missouri corporation registered to do business and doing business in California, including in this judicial district. It holds itself out as a company that prizes diversity.[1] But the Company's rhetoric on diversity and women's advancement rings hollow. In reality, Cushman & Wakefield and Defendants and each of them have shirked their obligations under the law through highly subjective compensation and evaluation practices, which they and each of they knew or should have known discriminate against female and older employees such as Ms. Barrett, and which did, in fact, discriminate against her.

4.    Over the course of Ms. Barrett's employment as an SVP of Strategic Services at Cushman & Wakefield, she was discriminated against based on her age and gender and failed to take measures to rectify the discrimination. Among other unlawful conduct, Defendants and each of them deprived Ms. Barrett of the same opportunities, treatment, and pay afforded to her younger and male colleagues and minimized Ms. Barrett's contributions. They and each of they also failed to honor the promises made to Ms. Barrett at the time of her hiring about her compensation structure and bonuses.

---

[1] *See e.g.*, *About Us*, Cushman & Wakefield (last visited Apr. 10, 2021), https://www.cushmanwakefield.com/en/united-states/about-us ("**We are inclusive.** We value difference and a culture where everyone belongs." (emphasis in original)); *Women's Integrated Network (WIN)*, Cushman & Wakefield (last visited Apr. 10, 2021), https://www.cushmanwakefield.com/en/united-states/about-us/womens-integrated-network ("Women's leadership, skills and acumen are a strength the firm can leverage to win new clients, attract new talent, and transform perceptions of the industry at large.").

1    These failures resulted in Ms. Barrett being severely underpaid.

2         5.      After Ms. Barrett complained to her male supervisors repeatedly about her disparate

3    compensation and treatment, and after Defendants received notice that she hired counsel to represent

4    her in her claims, Ms. Barrett's employment was terminated without notice or any progressive

5    discipline.

6    **II.    PARTIES**

7         6.      Ms. Barrett is a 64-year-old female resident of Leesburg, Virginia. She is a real estate

8    broker with decades of proven success. At all relevant times, Cushman & Wakefield was Ms.

9    Barrett's employer within the meaning of all applicable federal and state statutes.

10        7.      In January 2016, Ms. Barrett was hired as an SVP of Strategic Services based out of

11   Cushman & Wakefield's San Francisco office at 425 Market Street, although she worked primarily

12   from her home in Colorado. Cushman & Wakefield is registered to do business in California.

13   However, some of her team members had a regular physical presence in both its San Francisco and

14   San Jose offices, and her business dealings were primarily based in Northern California. This

15   arrangement required Ms. Barrett to travel to and from San Francisco at least twice per month, each

16   time for approximately three or four days.

17        8.      Despite her exemplary performance, Defendants and each of them terminated Ms.

18   Barrett in July 2019.

19        9.      Defendant Cushman and Wakefield, Inc. is a multibillion-dollar real estate company

20   incorporated in Missouri and registered to do business in California and headquartered in Chicago,

21   Illinois, with office locations worldwide, including in this judicial district in California.

22        10.     Cushman & Wakefield has four hundred offices in sixty countries and approximately

23   53,000 employees worldwide. The Company actively manages 3.6 billion square feet of real estate

24   for clients including major corporations, real estate developers, and investors. Cushman & Wakefield

25   collected a revenue of approximately $8.8 billion in 2019.

26        11.     Cushman & Wakefield has twelve offices in Northern California and employs over

27   three hundred brokerage professionals in the region.

28        12.     Defendant Raul C. Campos is an individual residing in Michigan. At all relevant times,

COSTANZO LAW FIRM
111 W. ST. JOHN, STE. 700
SAN JOSE, CA 95113

he was Executive Managing Director at Cushman & Wakefield.

13.     Defendant Campos Real Estate Advisory, Inc. is a California corporation with headquarters in Saline, Michigan and registered to do business and doing business in California and in this judicial district. On information and belief, Campos Real Estate Advisory, Inc. and Raul C. Campos are alter egos of each other: there is a unity of ownership interest between Mr. Campos and the entity, for which he has always been sole officer, director, and, on information and belief, sole shareholder, who so dominates and controls the entity that any separateness has ceased to exist. The entity is a mere shell, subterfuge, and instrumentality of Mr. Campos' real estate brokerage business and, on information and belief, Mr. Campos comingles and uses its assets interchangeably with his own, including but not limited to bank accounts and premises. The entity uses Mr. Campos' employees, such as Ms. Barrett, and vice versa, and the one is used to procure labor and services for the other; they fail to observe corporate formalities, e.g., in at least 2018, both failed to issue any tax forms to report payments to at least Ms. Barrett for income paid to Ms. Barrett by Campos Real Estate Advisory for wages owed to Ms. Barrett by Mr. Campos; and, they manipulate assets and liabilities between the entity and Mr. Campos so as to concentrate the assets in one and the liabilities in another, and to transfer to one the existing liability of the other, such as they did with wages owed to Ms. Barrett in at least 2018. Adhering to the fiction of the separate existence would sanction fraud and injustice and would permit an abuse of privileges because it would potentially shield one from liability for the tortious activities of the other. On information and belief, at all relevant times Mr. Campos/Campos Real Estate Advisory, Inc. employed five or more employees including Ms. Barrett.

14.     Defendant Kenneth J. Gilbert is an individual residing in Texas. At all relevant times, he was Executive Managing Director at Cushman & Wakefield. On information and belief, at all relevant times Mr. Gilbert employed five or more employees including Ms. Barrett.

15.     At all relevant times, including at the time of her termination, Ms. Barrett's direct supervisors were Executive Managing Directors Raul C. Campos and Kenneth J. Gilbert. At all relevant times, Mr. Campos and Mr. Gilbert were employees and/or agents of Cushman & Wakefield, as well as Ms. Barrett's supervisors at Cushman & Wakefield and each was acting within the course and scope of that employment and/or agency, and supervisory authority. At all relevant times, each

COSTANZO LAW FIRM
111 W. ST. JOHN, STE. 700
SAN JOSE, CA 95113

COSTANZO LAW FIRM
111 W. ST. JOHN, STE. 700
SAN JOSE, CA 95113

of the other Cushman & Wakefield employees and/or agents named in the Ms. Barrett's allegations, were also employees and/or agents of Cushman & Wakefield, and each was acting within the course and scope of that employment and/or agency in the conduct alleged.

16.     Additionally and in the alternative, at all relevant times, Mr. Campos (including individually and through the instrumentality of Campos Real Estate Advisory, Inc.) and Mr. Gilbert were joint employers with Cushman & Wakefield. Mr. Campos and Mr. Gilbert guaranteed half of Ms. Barrett's annual salary. Mr. Campos and Mr. Gilbert also agreed to pay and paid a portion of Ms. Barrett's compensation to her. For example, early 2016, when they all joined Cushman & Wakefield, Mr. Campos, Ms. Barrett, and Mr. Gilbert agreed that Ms. Barrett's annual bonus would be a share of the annual commissions collected on their team's accounts and transactions as alleged below. In 2018, Defendants agreed between themselves that they would pay additional compensation to Ms. Barrett. Based on what they agreed between themselves (which wrongfully shortchanged Ms. Barrett, as Defendants did in other years), Mr. Campos paid her $35,000 from a Campos Real Estate Advisory, Inc. account and Mr. Gilbert an additional $35,0000 to Ms. Barrett from a personal account. Mr. Gilbert also issued Ms. Barrett a 1099 for the portion he paid to her in 2018.

17.     Additionally and in the alternative, Mr. Campos (including individually and through the instrumentality of Campos Real Estate Advisory, Inc.) and Mr. Gilbert were joint venturers and/or partners with Ms. Barrett as part of the team to which they were all recruited and belonged at Cushman & Wakefield, the Strategic Consulting Team for the Western United States for Cushman & Wakefield ("Strategy Team"). Their joint venture and/or partnership was to build up their business as a team in the competitive field of strategic consulting in real estate and to share in the profits of their transactions, under an oral agreement reached in early 2016 when they joined Cushman & Wakefield as its new Strategy Team. Mr. Campos (including individually and through the instrumentality of Campos Real Estate Advisory, Inc.) and Mr. Gilbert received such profits that Ms. Barrett was entitled to share in and were responsible distributing those profits.

III.    **JURISDICTION AND VENUE**

18.     This Court has jurisdiction over this matter under 28 U.S.C. §§ 1332(a), 1331, 1343, and 1367, and 42 U.S.C. § 2000e-5(f)(3). Ms. Barrett's claims arise under the laws of the United

States and are brought to recover damages for deprivation of equal rights. The damages at issue in this case far exceed $75,000.

19.     This Court has personal jurisdiction over Defendant Cushman & Wakefield because it has offices and does business in this District, and because a substantial portion of the acts complained of and giving rise to the claims alleged occurred in this District. Additionally, key operative facts occurred in this judicial district, including that: (a) the employment relationship commenced and occurred in this judicial district—the offer of employment made by Cushman & Wakefield, signed by Tammi Blundo, Vice President, Human Resources, in the San Jose office and sent to Ms. Barrett from the San Jose office in this judicial district; (b) Ms. Barrett worked as an employee reporting to and based out of Cushman & Wakefield's San Francisco office; (c) her team members had a regular physical presence in the Northern California offices, and her business dealings as an employee were based primarily in Northern California. Additionally, Ms. Barrett was working in California as an employee (jointly with Mr. Campos and Mr. Gilbert) when the acts of discrimination, retaliation, breach of contract, fraud and other wrongdoing and harm was done to her.

20.     This Court has personal jurisdiction over Defendants Campos, Campos Real Estate Advisory, and Gilbert because each entered employment contracts with Ms. Barrett in California, which were to be performed and were performed primarily in California in this judicial district. Further, a substantial portion of each of their acts complained of and giving rise to the claims alleged occurred in this District. Additionally, key operative facts occurred in this judicial district, including that the employment relationship commenced and occurred in this judicial district. Ms. Barrett worked as their employee, jointly with Cushman & Wakefield, reporting to them and based out of Cushman & Wakefield's San Francisco office; her team members had a regular physical presence in the San Francisco office, and her business dealings as an employee were based primarily in Northern California. Additionally, Ms. Barrett was working in California as an employee (jointly with Mr. Campos, Campos Real Estate Advisory, and Mr. Gilbert) when the acts of discrimination, retaliation, breach of contract, fraud and other wrongdoing and harm was done to her.

21.     Venue is proper under 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000e-5(f)(3). The office out of which Ms. Barrett was employed at all relevant times is in San Francisco, California;

COSTANZO LAW FIRM
111 W. ST. JOHN, STE. 700
SAN JOSE, CA 95113

COSTANZO LAW FIRM
111 W. ST. JOHN, STE. 700
SAN JOSE, CA 95113

Defendants and each of them conducts substantial business in this District; and a substantial portion of the events and omissions giving rise to the claims alleged occurred in this District. In addition to the facts alleged above, important witnesses, including Raul Campos, Kenneth Gilbert, Kyle Hopkins, Shane Smith, and Michael Smith, as well as third-party witnesses including customer accounts relevant to the wrongdoing and damages alleged, are in the subpoena power of this district; and on information and belief, relevant documents pertaining to Ms. Barrett's employment are in Cushman & Wakefield's San Francisco and San Jose offices. Moreover, California has a strong interest in this case because it is about employment and an employment relationship in California.

22. This case is properly assigned to the San Jose Division because this is a civil action in which a substantial part of the events or omissions which give rise to the claims occurred in Santa Clara County, including, e.g., in San Jose, Sunnyvale, and Palo Alto, including the offer of employment made to Ms. Barrett from the San Jose office of Cushman & Wakefield, and accounts and transactions on which Ms. Barrett was unlawfully underpaid were located in Santa Clara County.

## IV. EXHAUSTION OF ADMINISTRATIVE REMEDIES

23. Ms. Barrett has timely exhausted all applicable administrative remedies. In July 2019, Ms. Barrett filed a Charge of Discrimination with the EEOC and cross-filed the Charge with the California Department of Fair Employment and Housing ("DFEH"). On June 16, 2021, she received a Notice of Right to Sue from the EEOC. **Exhibit 1** is a true and correct copy of this Notice of Right to Sue signed on behalf of the Commission on June 16, 2021. This timely lawsuit follows.

## V. FACTUAL ALLEGATIONS

### A. Ms. Barrett Boasts an Impressive Career in Real Estate.

24. When she re-joined Cushman & Wakefield in 2016 (after an earlier stint there from 2008–2011), Ms. Barrett had over thirty years of experience in national and international commercial real estate. Throughout her career, Ms. Barrett has successfully completed more than $2.5 billion in real estate advisory and transaction assignments for Fortune-500 clients as well as mid-cap and large-cap organizations. In 2002, she was among the first two hundred professionals to earn a Master's in Corporate Real Estate designation from CoreNet Global, a corporate real estate association for which she has served in several national and regional leadership roles.

COSTANZO LAW FIRM
111 W. ST. JOHN, STE. 700
SAN JOSE, CA 95113

25.     After working as a commercial broker from 1986 to 1993 in Northern Virginia, Ms. Barrett became Senior Vice President at the commercial real estate firm Frederick Ross, now known as Newmark Knight Frank, in Denver, Colorado. There, she developed a national account practice through a global network of privately held firms.

26.     In 1998, Ms. Barrett co-founded and held a Partner title with the California division of Liberty-Greenfield LLP, a boutique real estate transaction advisory organization. At Liberty-Greenfield, she provided commercial real estate strategies and solutions to corporations with significant real estate holdings in the United States. Ms. Barrett had a long-term working relationship, nearly twenty years, with Mr. Campos and Mr. Gilbert that began while they were all at Liberty-Greenfield, where for about ten years, they were partners in Liberty-Greenfield. They split all profits on every account or transaction split equally among them, with one-third to each, regardless of who did what work, who had led, or who had participated.

27.     The brokerage division of Liberty-Greenfield was purchased by Cresa Partners in 2008. Mr. Campos and Mr. Gilbert departed for CBRE Group, Inc. ("CBRE"). Ms. Barrett instead joined Cushman & Wakefield in 2008, along with another colleague from Liberty-Greenfield, Olan Young. Ms. Barrett joined Cushman & Wakefield this first time around as a Senior Director tasked with providing corporate advisory and transaction services to mid-cap corporations. While in this role, the U.S. Department of Energy's National Renewable Energy Laboratory selected Ms. Barrett to participate in its 2009 Executive Energy Leadership Program, during which she and approximately twenty other business, governmental, and community leaders were trained in advanced energy technologies to guide their respective organizations in energy-related decisions and planning.

28.     In 2011, Ms. Barrett left Cushman & Wakefield to join CBRE (at the request of Mr. Campos) as Senior Vice President of Global Corporate Services, a role in which she advised corporate real estate executives in their management of large real estate portfolios. At CBRE, Ms. Barrett worked loosely with Mr. Campos and Mr. Gilbert who were then already at CBRE. Ms. Barrett would occasionally bring Mr. Campos and Mr. Gilbert in on certain accounts or transactions and profit-sharing on those accounts or transactions was on a case-by-case basis. She also generated business opportunities from single real estate transactions and broker-led global accounts.

**B.      Defendants Recruited Ms. Barrett for Her Extensive Experience and Promised to Compensate Her for It.**

In January 2016, Ms. Barrett, at age 62, returned to Cushman & Wakefield—now as SVP—as part of a team of four professionals from CBRE (identified in the table below) to become their newly formed Strategy Team. The initial Strategy Team in 2016 is shown in **Table 1**, below.

| STRATEY TEAM MEMBERS | SEX | APPROX. AGE | CBRE TITLE | CUSHMAN TITLE |
|---|---|---|---|---|
| Raul Campos | Male | 69 | SVP | Executive Director |
| Kenneth Gilbert | Male | 73 | SVP | Executive Director |
| Sharon Barrett | Female | 62 | SVP | SVP |
| Olan Young | Male | 53 | Senior Financial Analyst | Senior Financial Analyst |

29.      Michael "Mike" Smith, Cushman & Wakefield's Regional Managing Principal for Northern California and the Pacific Northwest recruited the Strategic Consulting Team for the Western United States for Cushman & Wakefield ("Strategy Team").

30.      The Strategy Team was led by Mr. Campos and Mr. Gilbert, who, as noted, had been Partners with Ms. Barrett at Liberty-Greenfield while Ms. Barrett worked there beginning in 1998 and with whom she had moved to CBRE in 2011. When Ms. Barrett, Mr. Gilbert, and Mr. Campos joined Cushman & Wakefield in 2016 as the newly formed Strategy Team, their move made industry headlines in several business news publications.[2] The Strategy Team was tasked with leading strategic consulting for the western United States. If an inquiry came into Cushman & Wakefield regarding strategy either in the form of a high-profile, single asset project, a request for proposal for national or global real estate services, or a request for a pitch of a project that would require consulting, the Strategy Team would be contacted to propose a plan and secure the client.

31.      Mr. Campos and Mr. Gilbert were Ms. Barrett's joint employers with Cushman & Wakefield. **Exhibit 2** is a true and correct copy of Ms. Barrett's Employment Agreement with Cushman & Wakefield. Under the Employment Agreement, she earned an annual salary, initially

---

[2]*See, e.g.*, Julian Mark, *CBRE Denver Execs Jump to Rival Cushman & Wakefield*, Denver Bus. J. (Jan. 21, 2016), https://www.bizjournals.com/denver/news/2016/01/21/cbre-denver-execs-jump-to-rival-cushman-wakefield.html.

COSTANZO LAW FIRM
111 W. ST. JOHN, STE. 700
SAN JOSE, CA 95113

COMPLAINT FOR DAMAGES; JURY TRIAL DEMAND

$200,000 and a discretionary annual bonus determined by Mr. Campos and Mr. Gilbert. Mr. Campos and Mr. Gilbert guaranteed half of Ms. Barrett's salary. They determined and directed her assignments and tasks, objectives, and conditions of work, as well as her bonus.

32.     Ms. Barrett, Mr. Campos, and Mr. Gilbert had an oral agreement that they reached through in person discussions in early 2016, around the same time that she signed her Employment Agreement. The terms of this agreement were that the annual bonus she would be paid would as a share of profits generated by the Strategy Team; that her share would be almost equal to Mr. Gilbert and Mr. Campos'—each of Mr. Campos and Mr. Gilbert would therefore get approximately one-third,[3] and Ms. Barrett, as agreed, would get "slightly less" or "a few points below 33%"; that her share of the profits as an annual bonus would not be offset in any way by her salary or company benefits;[4] and that Mr. Gilbert and Mr. Campos (including individually and through the instrumentality of Campos Real Estate Advisory, Inc.) would receive and distribute those profits as they had agreed.

33.     As noted, Mr. Gilbert, Mr. Campos, and Ms. Barrett had longstanding professional relationships, and Ms. Barrett was known for securing noteworthy partnerships and executing lucrative deals. She was expected to be actively involved in every one of Mr. Campos's deals and pursuits. Ms. Barrett was further expected to generate new business and manage client engagements

---

[3] On each transaction that the Strategy Team worked on, there would be a broker of record, who collected the fees. Cushman & Wakefield policy required that there be a local broker, a broker who was local to the office where a transaction occurred, who collected and disbursed the fees, and who also took a cut. Mr. Gilbert was often this broker of record, for the transactions in San Francisco. The team would be required to engage another local broker as broker of record for locations elsewhere, such as in Palo Alto or in Colorado. In all cases, any commissions to the Strategy Team were disbursed to Mr. Campos and Mr. Gilbert, who then were supposed to pay them out to the members of the team who, by agreement, received a share as a bonus. Not all members of the team received a share of the Strategy Team's commissions; in fact, it was Ms. Barrett, Mr. Campos, and Mr. Gilbert who were to receive those shares.

[4]For example, Ms. Barrett's salary was not a draw payment. After any local brokers at Cushman & Wakefield and elsewhere receive a draw—an up-front loan that must be repaid to the Company through client fees before the broker can collect any commissions payments. At no point in the weeks leading up to Ms. Barrett's hire nor at any time did Mr. Campos, Mr. Gilbert, or anyone else at Cushman & Wakefield inform Ms. Barrett that her salary was a draw payment. In fact, she was specifically told that her salary was not a draw payment. Thus, as noted previously, the amount of Ms. Barrett's annual salary was not considered a part of, nor did it offset, the share she was supposed to receive as a bonus.

in the same manner as Mr. Campos and Mr. Gilbert. She was induced by Mr. Campos and Mr. Gilbert to trust and rely upon the oral agreement they reached with her and promises that they made to her.

34.     Additionally and in the alternative, Mr. Campos (including individually and through the instrumentality of Campos Real Estate Advisory, Inc.) and Mr. Gilbert were joint venturers and/or partners with Ms. Barrett as part of the team to which they were all recruited and belonged at Cushman & Wakefield, the Strategic Consulting Team for the Western United States for Cushman & Wakefield ("Strategy Team"). Their joint venture and/or partnership was to build up their business as a team in the competitive field of strategic consulting in real estate and to share in the profits of their transactions, under an oral agreement reached in early 2016 when they joined Cushman & Wakefield as its new Strategy Team. Mr. Campos (including individually and through the instrumentality of Campos Real Estate Advisory, Inc.) and Mr. Gilbert received such profits that Ms. Barrett was entitled to share in and were responsible distributing those profits. All commissions that the Strategy Team earned were paid directly to them, in amounts calculated based upon Cushman & Wakefield's Standard Schedule of Compensation for Brokerage and Sale Personnel, a true and correct copy of which is attached as **Exhibit 3.** This distribution to the Strategy were calculated based on two components, a "local split" component and a "sliding scale" component. The local split was 50% of the gross commissions collected annually. Ex. 3 at § I(A). For transactions over certain amounts, the sliding scale component also kicked in, as shown in **Table 2**, below:

**Commission Percentages to Strategy Team Based on Gross Commissions**

| Gross Commissions | Local Split | Sliding Scale Split |
|---|---|---|
| $500,000 | 50% | None |
| $500,001–$700,000 | 50% | 5% of gross commissions over $500,000 |
| $700,001–$900,000 | 50% | 10% of gross commissions over $700,000 |
| $901,000+ | 50% | 15% of gross commissions over $700,000 |

35.     For example, if the gross fees collected in a year were $1,000,000.00, the Strategy Team got a total of $545,000.00 to be distributed to Ms. Barrett, Mr. Campos, and Mr. Gilbert according to their 2016 oral agreement, as shown in **Table 3**, below:

| | | |
|---|---|---|
| 50% | Of the first $500,000 = | $250,000.00 |
| 55% | Of the next $200,000 up to $700,000 = | $110,000.00 |
| 60% | Of the next $200,000 up to $900,000 = | $120,000.00 |
| 65% | Of amounts over $900,000 = | $65,000.00 |
| | Example Total | $545,000.00 |

COSTANZO LAW FIRM
111 W. ST. JOHN, STE. 700
SAN JOSE, CA 95113

36.     This venture and/or partnership required effort, skill, management, tact, and special skills from Ms. Barrett. She brought existing client relationships, which she was responsible for developing and leading on further transactions and into broader, lucrative business opportunities. She was also responsible for generating business opportunities for the Strategy Team. Her responsibilities also included working with Mr. Campos and Mr. Gilbert in responding to requests for services proposals and providing written materials needed in the consulting sections of proposal responses. She also organized the materials for and participated in most, if not all, of Mr. Campos' proposals for new accounts and pursuits, leveraging her connections and industry expertise, managing relations with clients, and preparing presentations to generate further new business for the team. The time and effort she invested were successful.

**C.     Ms. Barrett's Success.**

37.     Ms. Barrett calculates that each year from 2016–2018, accounts she led, which were her client, or for which she did the majority of the work, were responsible for generating the majority of gross revenues earned by her Strategy Team. In **<u>Table 4</u>**, below, such accounts are in orange.

| Account | Year | Strategy Team Gross Revenue | Gross Commissions Collected | Strategy Team Commissions ($) |
|---|---|---|---|---|
| Client 1 | | $   287,804.00 | | |
| | Subtotal   2016 | $   287,804.00 | $   287,804.00 | $   143,902.00 |
| Client 2 - Pleasanton | | $   496,456.00 | | |
| Client 2 - Foster City | | $     75,000.00 | | |
| | Subtotal   2017 | $   571,456.00 | $   341,219.00 | $   170,610.00 |
| Client 3 | | $   154,511.00 | | |
| Client 4 - Sunnyvale | | $   350,000.00 | | |
| Client 5 San Jose | | $   458,850.00 | | |
| Client 5 Palo Alto | | $   347,666.00 | | |
| Client 5 Denver | | $ 1,638,336.00 | | |
| Client 4 - Seattle | | $   750,000.00 | | |
| | Subtotal   2018 | $ 3,699,363.00 | $2,454,523.00 | $ 1,227,262.00 |
| | Subtotal  2016-2018 | $ 4,558,623.00 | $3,083,546.00 | $ 1,541,774.00 |
| Client 3 - Expansion | | $   315,707.00 | | |
| Client 6 - Global | | $   550,000.00 | | |
| Client 6 - HQ | | $ 1,500,000.00 | | |
| Client 3 - Ghana, Africa | | $     50,000.00 | | |
| | Subtotal   2019 | $ 2,415,707.00 | | |
| | Total   2016-2019 | $ 6,974,330.00 | | |

COMPLAINT FOR DAMAGES; JURY TRIAL DEMAND

COSTANZO LAW FIRM
111 W. ST. JOHN, STE. 700
SAN JOSE, CA 95113

COSTANZO LAW FIRM
111 W. ST. JOHN, STE. 700
SAN JOSE, CA 95113

38. **Table 5** summarizes the revenues attributed to Ms. Barrett based on these accounts. [5]

| Year | Strategy Team Gross Revenues Amount ($) | Revenues Attributed to Ms. Barret Amount ($) | Amount (%) |
|---|---|---|---|
| 2016 | $ 287,804.00 | $ 287,804.00 | 100% |
| 2017 | $ 571,456.00 | $ 571,456.00 | 100% |
| 2018 | $ 3,699,363.00 | $ 2,542,847.00 | 69% |
| 2019 | $ 2,415,707.00 | $ 2,415,707.00 | 100% |
| 2016-2018 | $ 4,558,623.00 | $ 3,402,107.00 | 75% |
| 2016-2019 | $ 6,974,330.00 | $ 5,817,814.00 | 83% |

39. Throughout, Ms. Barrett performed her job more than satisfactorily. Ms. Barrett immediately excelled in her role by leveraging her professional reputation and relationships to generate business opportunities for the Strategy Team.

40. As noted, taking into account revenues in 2019, based on accounts initiated and did the substantial work for transactions in 2018 that were anticipated to close in 2019. She was responsible for 83% of the Strategy Team's gross revenues, on accounts she led or which were her client, or for which she did the majority of the work.

41. For example, in 2016, Ms. Barrett was responsible for a substantial amount of work on behalf of a multinational software corporation, which generated most of the commissions paid to her team that year. In 2017, of the two client accounts that generated the highest fees, Ms. Barrett led all the transactions for one, for requirements in the Bay Area, and worked and traveled extensively for the other In 2018, Ms. Barrett was responsible for generating approximately 69% of the client revenues collected by the Strategy Team—which included $1.6 million from a client she brought to Cushman & Wakefield. In 2018, she also expanded this client's business, bringing in another $310,000 in client fees in January 2019. From 2018 until the time of her termination, Ms. Barrett led a global client account for a company in Santa Clara County, with requirements for that account

[5] Note that in both tables, the Gross Commissions Collected and Strategy Team Commissions Collected are according to Mr. Campos and Mr. Gilbert in or around October 2018. They show commissions distributed to Mr. Campos and Mr. Gilbert for behalf of the Strategy Team's share, as about 50% of Gross Commissions Collected. As discussed above, those figures would have been higher, because 50% was only the local split; there would be an additional "sliding scale" split.

consisting of over 600,000 square feet and twenty-four active deals, including the headquarters disposition and acquisition, in eleven countries. At the time of her termination, this one client was slated to generate over $500,000 in client fees in 2019, plus an additional $2.5 million in fees at the closing of their headquarters transaction. Ms. Barrett also initiated and did substantial work for transactions in 2018 that were closing and/or anticipated to close in 2019 –2020, which is $2,415,707. In addition, there were other initiated client opportunities at various stages to close in 2019–2022 for a total of $15,175,000.

42.     Throughout her employment, Ms. Barrett regularly received praise from Mr. Campos and Mr. Gilbert on the large clients and deals that she cultivated and brought to the table. During Ms. Barrett's first two years back, Mr. Campos and Mr. Gilbert frequently lauded her work product as well as her business generation efforts. For example, Mr. Gilbert regularly commented on how organized and well-prepared Ms. Barrett was, and that she knew how to command a room. Similarly, after a strategy meeting regarding a prospective client in February 2018, Mr. Campos remarked that Ms. Barrett's self-driven work style enabled her to produce great results, and that he was impressed with how she excelled in addressing every client-related challenge that arose.

### D.     Bonuses and Information were Wrongfully and Discriminatorily Withheld.

43.     This praise however did not come with commensurate payments she was continuously promised and was in stark contrast to the discrimination she experienced due to her age and gender and the retaliation she faced for raising these issues with the two men. Despite her track record, and despite an agreement that split annual commissions earned by the Strategy Team among Mr. Campos, Mr. Gilbert, and Ms. Barrett (as alleged further below), and paid Ms. Barrett's share to her as an annual bonus, she never received nearly what she was entitled to; in **Table 4**, below, the Gross Commissions Collected, Strategy Team Commissions, and payments to Mr. Campos and Mr. Gilbert are based upon figures from Mr. Campos and Mr. Gilbert on or about October 14, 2018 (Exhibit 4).

| Year | Strategy Team Gross Revenue | Gross Commissions Collected ($) | Strategy Team Commissions ($) | Paid to Raul Campos | | Paid to Ken Gilbert | | Paid to Sharon Barrett | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | ($) | (%) | ($) | (%) | ($) | (%) |
| 2016 | $ 287,804.00 | $ 287,804.00 | $ 143,902.00 | $ - | 0.0% | $ - | 0.0% | $ - | 0.0% |
| 2017 | $ 571,456.00 | $ 341,219.00 | $ 170,610.00 | $ 107,000.00 | 62.7% | $ 107,000.00 | 62.7% | $ - | 0.0% |
| 2018 | $ 3,699,363.00 | $ 2,454,523.00 | $ 1,227,262.00 | $ 692,718.00 | 56.4% | $ 692,718.00 | 56.4% | $ 70,000.00 | 5.7% |
| 2016-2018 | $ 4,558,623.00 | $ 3,083,546.00 | $ 1,541,774.00 | $ 799,718.00 | 51.87% | $ 799,718.00 | 51.87% | $ 70,000.00 | 4.54% |

COSTANZO LAW FIRM
111 W. ST. JOHN, STE. 700
SAN JOSE, CA 95113

44.     After joining Cushman & Wakefield in 2016, over the next three years, the Strategy Team ramped up and secured lucrative client engagements. They began to generate increasingly substantial commission earnings, accelerating in 2018. At varying times, Defendants represented different figures to Ms. Barrett. Based on gross commission collected, and amounts distributed to the Strategy Team, figures given to Ms. Barrett by Mr. Gilbert and Mr. Campos on or around October 14, 2018, Ms. Barrett's shares are calculated between 31–33% below. As also shown in **Table 5**, below, however, she was not paid anything close to her share. Ms. Barrett received no bonus in 2016 and 2017 and far below the bonus she was owed in 2018.

| Year | Gross Commissions Collected | Strategy Team Total Split | Share of Total Team Split | | | Paid to Ms. Barrett as Annual Bonus |
|------|------|------|------|------|------|------|
| | | | **31%** | **32%** | **33%** | |
| 2016 | $287,804.00 | ~$143,902 (50%) | $44,609.62 | $46,048.64 | $47,487.66 | $0.00 (0%) |
| 2017 | $341,219.00 | ~$170,610 (50%) | $52,899.10 | $54,595.20 | $56,301.30 | $0.00 (0%) |
| 2018 | $2,454,523.00 | ~$1,227,262 (~61%) | $380,451.22 | $392,723.84 | $404,996.46 | $70,000.00 (4.7%) |

45.     They denied Ms. Barrett substantial payments that she was promised and that she earned based on the high quality and scope of her work on behalf of her team's client accounts.

46.     Ms. Barrett received little to no information in response to her repeated requests to Mr. Campos and Mr. Gilbert each year for the criteria against which her performance was be evaluated, for information about the team's earnings, and for her portion of those earnings, and what information she did receive was inconsistent.

47.     In early 2018, Mr. Campos had affirmed their agreement, telling Ms. Barrett that she would make slightly less than 33% of the Strategy Team's gross collected commissions that year. Motivated by the potential payout, she worked even harder to garner business and close out deals. She brought in at least 69% of the gross fees from the Strategy Team's projects that year (Table 3).

48.     Yet in September 2018, Mr. Campos informed her that she would receive only a $40,000 bonus.

COSTANZO LAW FIRM
111 W. ST. JOHN, STE. 700
SAN JOSE, CA 95113

49.     Thereafter, Ms. Barrett had multiple conversations with Mr. Campos and Mr. Gilbert. She asked that Mr. Campos provide an accounting of the allocations and how the bonus was calculated. Mr. Campos at first refused; he screamed at Ms. Barrett, saying that she should be trusting him, that it would be a lot of work for him to provide the accounting information because Cushman & Wakefield's accounting system was malfunctioning, and that nothing would change regarding Ms. Barrett's allocation. After Ms. Barrett insisted that she deserved to see the accounting details, Mr. Campos screamed at her again. He finally agreed to procure the accounting information for her, but what information she got was inconsistent and incomplete.

50.     In October 2018, Mr. Gilbert and Mr. Campos gave her a spreadsheet, a true and correct copy of which is attached as **Exhibit 4**, and excerpt of which his below (but which were not backed by accounting).

| A | B | C | D | E |
|---|---|---|---|---|
| **Year** | **Total Gross Collected Commissions** | **SGB Bonus 10.0% (10% X B)** | **Less: SGB Salary (C-D)** | **SGB Net Bonus (C-D)** |
| 2016 | $287,804 | $28,780 | $200,000 | $0 |
| 2017 | $341,219 | $34,122 | $203,600 | $0 |
| 2018 | $2,454,523 | $245,452 | $204,800 | $40,652 |
| Total | $3,083,547 | | $608,400 | $40,652 |

| | RC & KG | Total |
|---|---|---|
| **SGB 2018 Bonus** | | |
| 2018 Bonus | $20,326 | $40,652 |
| Special Discretionary Bonus | $14,674 | $29,348 |
| Total | $35,000 | $70,000 |

51.     The October 2018 figures also showed that what Mr. Campos and Mr. Gilbert allotted to themselves was much higher: $107,000 each in 2017 and $692,718 each in 2018. Ex. 4.

52.     To continue to conceal their wrongdoing and lull her, and taking full advantage of the trust and confidence that she placed in them, Defendants kept making representations and explanations to Ms. Barrett that would later be revealed to be false, while holding back information and lying about commissions collected and distributed. After Mr. Campos had spun various stories to explain away the discriminatory allocation and why she was no longer entitled to any amount approximating 33% of what was collected to the Strategy Team in 2018, Mr. Campos told Ms. Barrett

COSTANZO LAW FIRM
111 W. ST. JOHN, STE. 700
SAN JOSE, CA 95113

that he and Mr. Gilbert would each pay her an additional $15,000 each. This addition brought her total 2018 bonus that she received in November to $70,000. Based on the agreed structure, Ms. Barrett should have earned a bonus of $491,845.18 for 2018; instead, she earned $70,000. Yet, according to their own figures (if they were even correct), her male partners, Mr. Campos and Mr. Gilbert, earned at least $692,718.00 each. Mr. Campos and Mr. Gilbert exercised their discretion regarding Ms. Barrett's annual bonus in a blatantly discriminatory manner.

53.     Additionally, although in January 2019 at an in-person meeting with Mr. Campos and Mr. Gilbert in a conference room, Mr. Campos agreed to pay Ms. Barrett a bonus from the $310,000 in client fees paid by Client 4, but she never received any such payment, and despite Ms. Barrett following up, including in writing on at least October 12, 2018 and March 20, 2019. When Mr. Campos arbitrarily and only slightly decreased the vast discount of Ms. Barrett's earnings, in late February 2019, he said she was lucky to have her job and she should appreciate him.

54.     Cushman & Wakefield failed to provide any oversight of Mr. Campos and Mr. Gilbert enabled them to deny Ms. Barrett accurate and fair allocations after evaluating profits each year. Indeed, as alleged below, when Ms. Barrett retained counsel and complained, Cushman & Wakefield ratified Defendants' wrongdoing and terminated Ms. Barrett in retaliation.

**E.     Defendants Also Improperly Offset Ms. Barrett's Bonus Amount.**

55.     Additionally, Mr. Campos and Mr. Gilbert improperly reduced Ms. Barrett's fair share to be paid in her bonus by deducting work expenses billed to her employer-issued credit card, on which Cushman & Wakefield also failed to provide any proper oversight. The expense account was one of her employment benefits. The credit card was separately paid by Cushman & Wakefield, not out of any commissions collected, and any amounts did not offset what she was due in her bonus out of those commissions collected and distributed to the Strategy team.

56.     They also improperly tried to offset the amounts owed to Ms. Barrett as a bonus based on the amount paid as her salary. The salary was separately paid and did not offset what she was due as a bonus out of those commissions collected and distributed to the Strategy team. Even if Ms. Barrett's share of the Strategy Team's commissions were offset by her salary ($204,000), her total 2018 compensation, including the $70,000 bonus, constituted approximately 17% of the team's

commission that year—far from anything approximating 33%.

57.     Cushman & Wakefield failed to provide any oversight of Mr. Campos and Mr. Gilbert and enabled them to improperly offset Ms. Barrett's accurate and fair allocations. Indeed, as alleged below, when Ms. Barrett retained counsel and complained, Cushman & Wakefield ratified Defendants' wrongdoing and terminated Ms. Barrett in retaliation.

**F.      Defendants Also Paid Younger, Male Team Members More than Ms. Barrett.**

58.     Mr. Campos and Mr. Gilbert exercised their discretion regarding Ms. Barrett's annual bonus in further discriminatory manner. At the same time Mr. Campos and Mr. Gilbert were failing to fully pay Ms. Barrett her promised bonus, they provided substantial payments to the younger men. When the Strategy Team first joined Cushman & Wakefield (then consisting of Mr. Campos, Mr. Gilbert, Ms. Barrett, and Mr. Young). Mr. Young stopped working exclusively with the team in 2017. In 2018, additional people joined the Strategy Team, all under age 40, and remained a part of it until Ms. Barrett's termination: Kyle Hopkins (aged 32) and Shane Smith (son of Mike Smith and aged 22). That same year, Mr. Campos also announced that Elisa Konik (aged 36) would be brought in as needed on different projects.

59.     Despite Ms. Barrett's excellent performance and tremendous contributions, Defendants discriminatorily denied her fair compensation in bonus payments associated with lucrative deals that she originated and/or for which she did most of the work.

60.     For example, a major account Ms. Barrett brought in and later assumed leadership of, generated at least $550,000 in revenue with another $2.5 million in the pipeline. This account was set to bring in a significant portion of client fees in 2019 and 2020. Yet, Mr. Campos stated both Ms. Barrett and Shane Smith 25% each of the commission given to the Strategy Team related to this account. Shane Smith, aged 22 and newly hired was less experienced, and, as Tenant Representation Advisor, had very little responsibility compared to Ms. Barrett, the SVP and account leader. He had a BA in corporate communications and public affairs and a BA in film from Southern Methodist University, and professional experience as a camp counselor and a sales associate at Marine Layer, but he had no experience in realty, compared to Ms. Barrett's experience and track record. **Exhibit 5** is a true and correct copy of Mr. Smith's LinkedIn page. He was, however, male, young, and Mike

COSTANZO LAW FIRM
111 W. ST. JOHN, STE. 700
SAN JOSE, CA 95113

Smith's son. Later, in September 2018, at an in-person meeting in his San Francisco office, Mr. Campos changed his mind and told Ms. Barrett that she would only be given a bonus of "at most" 10%. When she challenged him, he said, "then you can leave, you can quit, Sharon."

61.     Similarly, Mr. Campos informed Ms. Barrett that Defendants committed to pay another less experienced and younger, male broker, Mr. Hopkins, 25% of the commissions for any client accounts involving Mr. Campos, and 50% of commissions for any new deals that Mr. Hopkins originated. This type of allocation was never paid to Ms. Barrett. Prior to joining Cushman & Wakefield, Mr. Hopkins had run his own brokerage company based in Newport Beach, California and was a partner in the national QSR restaurant chain, Pieology Pizzeria. Ms. Barrett far outpaced him in experience and track record.

62.     On another client transaction, the Strategy Team hired Brian Hutt in the Denver office as local broker. He was only in the business for six years, and in his early thirties, but he received 25% of that transaction, and 25% of an additional project for the same client. Ms. Barrett received just $70,000, at most 4.7% for the Strategy Team's split for all of 2018---nothing close to what Mr. Hutt received on just those two transactions.

63.     Younger men were more highly compensated for their minimal efforts on matters that Ms. Barrett shouldered. Mr. Smith, Mr. Hopkins, and Mr. Hutt were each male, and younger. Mr. Hutt and Mr. Hopkins were at least thirty years younger than Ms. Barrett. Mr. Hopkins was close to forty years younger. Cushman & Wakefield failed to provide any oversight of Mr. Campos and Mr. Gilbert enabled them to discriminate against Ms. Barrett. Indeed, as alleged below, when Ms. Barrett retained counsel and complained, Cushman & Wakefield ratified Defendants' wrongdoing and terminated Ms. Barrett in retaliation. In paying Ms. Barrett's younger and less experienced male counterparts equal or greater amounts for lesser work, Defendants diminished the value of Ms. Barrett's significant contributions and committed discrimination.

**G.     Ms. Barrett's Terms and Conditions of Employment Differed from her Male Comparators.**

64.     Defendants and each of them also subjected Ms. Barrett to disparate terms of employment and treatment due to her age and gender.  Cushman & Wakefield failed to provide any

COSTANZO LAW FIRM
111 W. ST. JOHN, STE. 700
SAN JOSE, CA 95113

oversight of Mr. Campos and Mr. Gilbert that enabled them on all wrongdoing alleged as well. Indeed, as alleged below, when Ms. Barrett retained counsel and complained, Cushman & Wakefield ratified Defendants' wrongdoing and terminated Ms. Barrett in retaliation.

### 1. Defendants Discriminated Against Her on Terms for Advancement and Promotion.

65.     When the Strategy Team agreed to move to Cushman & Wakefield, the company required an employee to generate at least $1 million in client fees for two years to become an Executive Director. Cushman & Wakefield made an exception for Mr. Campos and for Mr. Gilbert but did not make the same exception for Ms. Barrett.

66.     Unlike Mr. Campos and Mr. Gilbert, two of Ms. Barrett's teammates whose titles Cushman & Wakefield elevated from SVP (at CBRE) to Executive Director, Ms. Barrett was forced to keep her SVP title.

### 2. They Excluded Ms. Barrett to Replace her with Younger, Male Employees.

67.     As shown above, the two men selected by Mr. Campos and Mr. Gilbert to join Ms. Barrett's team were substantially younger than she is and had considerably less commercial real estate experience than her. In mid-2018, upon the hiring of Mr. Hopkins and Mr. Smith, Mr. Campos began ignoring Ms. Barrett's emails and calls and excluding her from meetings with prospective and current clients. Yet, Mr. Campos and Mr. Gilbert did not ignore younger and male team members like Mr. Smith and Mr. Hopkins and in fact, brought them into the fold.

68.     Ms. Barrett first learned that Mr. Hopkins would be joining the Strategy Team exclusively and full-time not by an announcement, but by an Outlook invitation for a team-wide marketing meeting in early October 2018. Mr. Campos failed to alert her to the impact of new team members on the team's split.

69.     When Ms. Barrett called Mr. Campos on October 12, 2018 to ask why Mr. Hopkins had been added to the team and why Mr. Campos had not discussed this with her previously, Mr. Campos went on a ten-minute tirade filled with profanities and hostility. During his outburst, he screamed at Ms. Barrett that it was "none of [her] fucking business who [he] work[s] with" and that he was "sick" of Ms. Barrett.

COSTANZO LAW FIRM
111 W. ST. JOHN, STE. 700
SAN JOSE, CA 95113

70.     On October 22, 2018, when Ms. Barrett met with Mr. Campos in San Francisco, he explained that Mr. Hopkins was a "young version" of Mr. Gilbert, and Mr. Campos insisted that Ms. Barrett promise not to mention his outburst to anyone or bring it up again. Mr. Campos subsequently replaced Ms. Barrett with Mr. Hopkins on all business projects and pursuits going forward. but failed to terminate Ms. Barrett until July 29, 2019.

71.     Not only was Ms. Barrett denied her bonus and replaced on significant accounts, but she was also told her salary would have to be reduced. In an in-person meeting in his San Francisco office in 2019, Mr. Campos informed Ms. Barrett that her 2020 salary would need to be reduced to pay for the salaries of Mr. Hopkins and Mr. Smith. This was not in Ms. Barrett's agreements. Defendants were trying to force Ms. Barrett to reduce her salary, or to go off-salary, to pay the younger men, who were being brought in to replace her. They made clear that Ms. Barrett would be the person to bear the financial burden of her replacement by two younger, male team members.

### 3.     Defendants Blocked Ms. Barrett from Receiving Additional Compensation from a Client Representative.

72.     In October 2018, a month after Ms. Barrett had complained to Mr. Campos about her discriminatorily low bonus and inquired about an unannounced team member, Mr. Hopkins, Mr. Campos blocked her without justification from receiving additional incentive pay from a client, even though such an arrangement is a standard practice at Cushman & Wakefield and other companies. Specifically, a client representative offered to pay Ms. Barrett an additional salary for taking on more responsibilities to lead their client account. This type of additional incentive compensation is common among account leads at Cushman & Wakefield and makes up a significant amount of employees' expected annual earnings.

73.     Before Ms. Barrett could even respond, Mr. Campos declined the client's offer on Ms. Barrett's behalf without conferring with her. He did this even though Ms. Barrett's accepting offer would not have impacted commissions paid to the Strategy Team in any way. As a result, Ms. Barrett took on the additional work required to run the account without any additional compensation. Upon information and belief, Mr. Campos has never rejected a similar offer on behalf of a younger or male employee.

COSTANZO LAW FIRM
111 W. ST. JOHN, STE. 700
SAN JOSE, CA 95113

**4.    Defendants Set up Plaintiff to Fail by Only Sharing Client Information with the Younger, Male Comparators**

74.    Mr. Campos stopped adding client information to the Strategy Team's shared Cushman Dropbox drive. Instead, for at least ten months leading up to Ms. Barrett's termination, he started saving client information on his personal computer and using a second shared drive exclusively with Kyle Hopkins, instead of the team's shared Cushman Dropbox. That repository on Dropbox had been the central file system for the team for all its projects, on the order of thirty projects, and was supposed to be kept up-to-date as the central system for documents exchanged on each project. Yet as of June 5, 2019, Mr. Campos had not updated the Dropbox for over three and a half months, since February 18, 2019.

75.    Defendants' and each of their icing out of Ms. Barrett was done to impair her ability to do her job effectively and efficiently and was so unusual that even prospective clients commented on it. On at least three instances, the prospective client contacted Ms. Barrett after the pitch meeting with Mr. Campos to inquire about her well-being and to ask why she had not attended.

**5.    They Imposed Discriminatorily Imposed Conditions on Her Compensation.**

76.    In December 2018, Mr. Campos told Ms. Barrett that he would outline a bonus structure for 2019 based on a 2019 business plan from her. Yet, Mr. Hopkins and Mr. Smith did not have to produce a business plan as a necessary condition for their own allocations. Although Ms. Barrett sent Mr. Campos a business plan shortly after receiving his request, she never received feedback or his outline Thus, she was never provided with the information necessary to know how her bonus payments would be calculated for that year.

77.    When Ms. Barrett followed up with Mr. Campos regarding the plan, he told her that Mr. Gilbert was holding up the review process. However, whenever Ms. Barrett asked Mr. Gilbert for an update, he told her that Mr. Campos was the point person for her to talk to about the plan and structure. Their back and forth made clear they were going to continue to cheat her and discriminate against her.

78.    From at least October 2018 to her termination on July 29, 2019 Ms. Barrett had to endure nine months of humiliation as she was replaced on lucrative prospective and active client

accounts by Mr. Hopkins and Mr. Smith at Mr. Campos' direction.

### 6. Defendants Harbored a Toxic and Discriminatory Work Culture.

79. Throughout, Defendants' and each of their sexist and ageist culture permeated Ms. Barrett's day-to-day work. For example, while having lunch with Ms. Barrett, Mr. Campos suggested that she should have sex with a client to land a deal, "tak[ing] one for the team."

80. Mr. Campos also commented that Ms. Barrett should lose some weight.

81. When Mr. Campos replaced Ms. Barrett with Mr. Hopkins in 2018, he began berating her on a regular basis, making comments like, "If it weren't for me, you wouldn't have a job," and "You should be more appreciative of what I do for you." He also threatened Ms. Barrett by saying, "Mike Smith thinks I should fire you." As Cushman & Wakefield's Regional Managing Principal for Northern California and the Pacific Northwest, Michael Smith was Ms. Barrett's second-level supervisor and was responsible for Cushman & Wakefield's real estate business in her region. Again, Michael Smith is the father of Shane Smith, the 25-year-old comparator.

### H. Defendants Retaliated Against Ms. Barrett for her Protected Activity, Including By Terminating Her.

82. It was clear that Ms. Barrett would face retaliation if she reported the harassment and discriminatory treatment to human resources department or upper management. Michael Smith and Mr. Campos shared a close professional relationship. Mr. Smith had worked with both Mr. Gilbert and Mr. Campos while they were all at CBRE and they went back years. Mr. Smith and Mr. Campos went to lunch most weeks, one-on-one, and out to dinner and drinks at CBRE and Cushman & Wakefield. Mr. Campos became an advisor to Mr. Smith while they were at CBRE, and continued at Cushman & Wakefield, with Mr. Smith soliciting Mr. Campos's input and relying upon him to strategize and create presentations for Mr. Smith. Ms. Barrett was concerned that if she went to Human Resources, Michael Smith would have been notified. Mr. Campos explicitly threatened Ms. Barrett by saying that Michael Smith was in his "back pocket" and that Michael Smith would do whatever Mr. Campos asked, especially since Mr. Smith's son, Shane Smith, is Mr. Campos's runner. Mr. Campos's repeated commentary to this effect sent Ms. Barrett a clear message that Mr. Smith would never support her if he got wind of a complaint regarding Mr. Campos.

COSTANZO LAW FIRM
111 W. ST. JOHN, STE. 700
SAN JOSE, CA 95113

83.     However, Ms. Barrett did engage in protected activity by complaining repeatedly to Mr. Campos and Mr. Gilbert about her discriminatorily low compensation, in contrast to the pay and treatment of younger male employees, in October 2018 and early 2019.

84.     For example, in the meeting with Mr. Campos on October 12, 2018, Ms. Barrett asked him about his decision to add Mr. Hopkins to their team. She had originally been told that Mr. Hopkins and Mr. Smith were only on the team on an ad hoc basis and was, therefore, confused when they had started to replace her on her client accounts. In response to Ms. Barrett raising her concerns about being replaced by two less-experienced, male team members, Mr. Campos yelled at and cursed at her for implying that she was getting discriminatory treatment. Mr. Campos apologized to Ms. Barrett approximately one week after his inappropriate remarks and explained that Mr. Hopkins's elevated role in their group was primarily due to Mr. Hopkins being a "young version" of Mr. Gilbert.

85.     Mr. Campos retaliated against Ms. Barrett less than a month later by paying her less than 5% of her team's annual commissions earnings, even though she had earned and had been promised one third of her team's earnings. Further, he excluded her from most prospective client engagement opportunities, in favor of Mr. Hopkins and Mr. Smith. The dramatic shift in Mr. Campos's demeanor and treatment toward Ms. Barrett was further illustrated by him refusing to communicate with her for weeks at a time.

86.     Mr. Campos and Mr. Gilbert continued to deny Ms. Barrett what she was owed, to ostracize her from the team to and block her involvement in the securing of lucrative partnerships she helped form.

87.     Because she was continually subjected to age and gender discrimination, Ms. Barrett retained legal counsel to represent her in her claims. Defendants received notice of her legal representation on May 1, 2019.

88.     Following the receipt of this letter, Mr. Campos further reduced any sparse communication he had with Ms. Barrett and did not respond to her phone calls or emails. His last email communication with Ms. Barrett was on April 16, 2019. Mr. Gilbert, Elisa Konik, and Shane Smith also reduced their communications with Ms. Barrett upon the receipt of the notice of her legal representation.

COSTANZO LAW FIRM
111 W. ST. JOHN, STE. 700
SAN JOSE, CA 95113

COSTANZO LAW FIRM
111 W. ST. JOHN, STE. 700
SAN JOSE, CA 95113

89.     Less than three months after receiving notice of Ms. Barrett's legal representation, and in close proximity to Ms. Barrett's series of complaints about her discriminatorily low pay, Defendants fired her on July 29, 2019. She was abruptly terminated without notice or any progressive discipline on a phone call with Michael Smith and Senior Human Resources Manager Janie Guernsey. Following the call, Ms. Barrett received a letter from Michael Smith, which outlined several pretextual reasons for Ms. Barrett's termination, many if not all of which had never been raised to her previously as sources of concern or room for development.

90.     Mr. Campos replaced Ms. Barrett with Mr. Hopkins and/or Mr. Smith on almost all of her accounts leading up to and following her termination.

### I.     Defendants' Discrimination and Retaliation Has Stunted Ms. Barrett's Career and Caused Her Significant Emotional Distress.

91.     Since this occurred, Ms. Barrett has had a very difficult time finding comparable employment, despite searching for an equivalent position for over two years. Hiring freezes spurred by the global pandemic have exacerbated her inability to secure new employment to pay off expenses and support her family.

92.     Ms. Barrett has suffered significant emotional distress due to Defendants' and each of their illegal actions. In addition to the humiliation and reputational harm inflicted upon her, Ms. Barrett has suffered from depression, insomnia, and anxiety. Her well-being and circumstances have been further impacted by the unjustified, abrupt, and humiliating way Defendants and each of them terminated her employment on the heels of her hiring legal counsel.

## VI.     CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### Denial of Equal Pay
### in Violation of the Fair Labor Standards Act of 1938, as amended by
### the Equal Pay Act, 29 U.S.C. § 206(d); 29 U.S.C. § 216(b)
### Against Defendant Cushman & Wakefield

93.     Ms. Barrett re-alleges and incorporates by reference each allegation in the previous paragraphs.

94.     At all relevant times, Defendants and each of them employed Ms. Barrett within the

meaning of the Fair Labor Standards Act of 1938 ("FLSA"), as amended by the EPA, 29 U.S.C. §§ 206, *et seq*. Defendants and each of them discriminated against Ms. Barrett in violation of the FLSA as amended by the EPA, including but not limited to paying Ms. Barrett less than male colleagues performing substantially equal work on jobs requiring equal skill, effort, and responsibility, and which are performed under similar working conditions.

95.     Defendants and each of them have also subjected Ms. Barrett to discriminatory pay policies and practices, including a discriminatory system of determining salaries, commissions, bonuses, and other compensation incentives, as well as of determining promotions impacting compensation, which resulted in similarly situated employees performing the same tasks receiving different compensation; and other forms of discrimination affecting pay.

96.     The differential in pay between male and female employees on Ms. Barrett's team was not due to seniority, merit, quantity or quality of production, or any other permissible factor.

97.     Defendants and each of them willfully caused, attempted to cause, contributed to, or caused the continuation of, the wage rate discrimination based on sex in violation of the EPA. Because Cushman & Wakefield has willfully violated the EPA, as alleged more fully above, a three-year statute of limitations applies to such violations under 29 U.S.C. § 255.

98.     As a result of Cushman & Wakefield's conduct alleged in this Complaint, Ms. Barrett has suffered and will continue to suffer harm, including but not limited to lost earnings, lost benefits, and other financial loss, as well as non-economic damages.

99.     By reason of Cushman & Wakefield's discrimination, Ms. Barrett is entitled to all legal and equitable remedies available for violations of the EPA including liquidated damages for all willful violations, prejudgment interest, attorney's fees, costs, and other compensation pursuant to 29 U.S.C. § 216(b). Attorney's fees should be awarded under 29 U.S.C. § 216(b).

//
//
//
//
//

COSTANZO LAW FIRM
111 W. ST. JOHN, STE. 700
SAN JOSE, CA 95113

COSTANZO LAW FIRM
111 W. ST. JOHN, STE. 700
SAN JOSE, CA 95113

**SECOND CLAIM FOR RELIEF**

**Retaliation**

**in Violation of the Fair Labor Standards Act of 1938, as amended by**

**the Equal Pay Act of 1963, 29 U.S.C. § 215(a)(3); 29 U.S.C. § 216(b)**

**Against Defendant Cushman & Wakefield**

100.    Ms. Barrett re-alleges and incorporates by reference each allegation in the previous paragraphs.

101.    Ms. Barrett engaged in protected activity under the FLSA by complaining to Mr. Campos and Mr. Gilbert about her discriminatorily low pay on multiple occasions.

102.    Defendants and each of them engaged in adverse employment actions against Ms. Barrett for engaging in protected activities. These adverse employment actions included subjecting her to materially unfavorable terms and conditions of employment, such as denials of compensation and opportunities afforded to her male comparators, and ultimately her termination.

103.    Defendants' and each of their retaliatory acts against Ms. Barrett were a direct and proximate result of her protected activities.

104.    A reasonable employee would find Defendants' and each of their retaliatory acts materially adverse and such acts would dissuade a reasonable person from making or supporting a charge of discrimination.

105.    As a result of Defendants' and each of their conduct alleged in this complaint, Ms. Barrett has suffered and will continue to suffer harm, including but not limited to lost earnings, lost benefits and other financial loss, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

106.    Under 29 U.S.C. § 216(b), Ms. Barrett is entitled to liquidated damages, attorney's fees, and other relief.

//

//

//

//

COSTANZO LAW FIRM
111 W. ST. JOHN, STE. 700
SAN JOSE, CA 95113

**THIRD CLAIM FOR RELIEF**

**Gender Discrimination**

**In Violation of Title VII of the Civil Rights Act of 1964 ("Title VII"),**

**42 U.S.C. § 2000e, *et seq***

**Against Defendant Cushman & Wakefield**

107.     Ms. Barrett re-alleges and incorporates by reference each allegation in the previous paragraphs.

108.     As alleged more fully above, Defendants and each of them, Ms. Barrett's employer within the meaning of Title VII, discriminated against Ms. Barrett in violation of Title VII by subjecting her to different treatment on the basis of her gender, including by engaging in intentional disparate treatment and by maintaining policies and practices that had an adverse, disparate impact on her.

109.     Ms. Barrett is a woman, a protected class under Title VII.

110.     At all relevant times she was qualified for the positions she held.

111.     However, she was subject to adverse employment actions. Defendants and each of them have engaged in an intentional, company-wide, and systemic policy, pattern, and/or practice of discrimination against Ms. Barrett by, among other things: maintaining a discriminatory system of determining salaries, bonus or commissions payments, bonuses, and other compensation incentives; discrimination in assignments; maintaining a discriminatory system of bonus or commission payment allocation; maintaining a discriminatory system for promotions; and other forms of discrimination.

112.     These foregoing policies, practices, and/or procedures have produced an unjustified disparate impact on Ms. Barrett with respect to the terms and conditions of her employment. The policies, practices, and/or procedure, and the criteria under them, fell more harshly on women than on men. As a result of this disparate treatment and disparate impact discrimination, Defendants and each of them have treated Ms. Barrett differently from and less preferentially or favorably than similarly situated male employees, outside the protected class of women, with respect to compensation, bonus or commissions payments, job assignments, and promotions.

113.     Defendants and each of them have also failed to prevent, respond to, adequately

COSTANZO LAW FIRM
111 W. ST. JOHN, STE. 700
SAN JOSE, CA 95113

investigate, and/or appropriately resolve this gender discrimination.

114. Defendants' and each of their conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of Ms. Barrett, entitling Ms. Barrett to punitive damages.

115. As a result of Defendants' and each of their conduct alleged in this Complaint, Ms. Barrett has suffered and will continue to suffer harm, including but not limited to, lost earnings and other financial loss, as well as non-economic damages.

116. By reason of the continuous nature of Defendants' and each of their discriminatory conduct, which persisted throughout Ms. Barrett's employment, the continuing violations doctrine applies to all violations alleged.

117. By reason of Defendants' and each of their discrimination, Ms. Barrett is entitled to all legal and equitable remedies available for violations of Title VII.

118. Ms. Barrett is entitled to an award of attorney's fees under 42 U.S.C. § 2000e-5(k).

## FOURTH CLAIM FOR RELIEF

### Retaliation

### in Violation of Title VII, 42 U.S.C. § 2000e-3(a)

### Against Defendant Cushman & Wakefield

119. Ms. Barrett re-alleges and incorporates by reference each allegation in the previous paragraphs.

120. Ms. Barrett engaged in protected activity that included, but is not limited to, complaining to Mr. Campos and Mr. Gilbert about her discriminatorily low pay, which she did on multiple occasions. Ms. Barrett also engaged in protected activity when she retained counsel, who informed Defendants of its representation of Ms. Barrett in her claims prior to Ms. Barrett's termination.

121. Defendants and each of them engaged in adverse employment actions against Ms. Barrett for engaging in protected activities. These adverse employment actions included subjecting her to materially unfavorable terms and conditions of employment, such as denials of compensation and opportunities afforded to her male comparators, and ultimately terminating her.

COSTANZO LAW FIRM
111 W. ST. JOHN, STE. 700
SAN JOSE, CA 95113

122.    Defendants' and each of their retaliatory acts against Ms. Barrett were a direct and proximate result of her protected activities.

123.    A reasonable employee would find Defendants' and each of their retaliatory acts materially adverse and such acts would dissuade a reasonable person from making or supporting a charge of discrimination.

124.    Defendants' and each of their conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of Ms. Barrett, entitling her to punitive damages.

125.    As a result of Defendants' and each of their conduct alleged in this complaint, Ms. Barrett has suffered and will continue to suffer harm, including but not limited to lost earnings, lost benefits and other financial loss, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

126.    Ms. Barrett is entitled to all legal and equitable remedies available for violations of Title VII, including an award of punitive damages.

127.    Attorney's fees and costs should be awarded under 42 U.S.C. § 2000e-5(k).

### FIFTH CLAIM FOR RELIEF

### Age Discrimination

### In Violation of the Age Discrimination in Employment Act of 1967 ("ADEA"),

### 29 U.S.C. §§ 621, *et seq.*; 29 U.S.C. § 216(b)

### Against Defendant Cushman & Wakefield

128.    Ms. Barrett re-alleges and incorporates by reference each allegation in the previous paragraphs.

129.    Defendants and each of them were Ms. Barrett's employer within the meaning of the ADEA and discriminated against Ms. Barrett in violation of the ADEA with respect to her compensation as well as other terms, conditions, and privileges of her employment.

130.    At all relevant times and throughout her employment by Defendants and each of them, Ms. Barrett was a member of a protected class as an employee older than forty.

131.    As alleged more fully above, at all relevant times, Ms. Barrett was performing her job

satisfactorily.

132.  Because of Ms. Barrett's age, Defendants and each of them took adverse employment actions against her. She had job assignments, promotions, and bonus payments taken away from her and was eventually replaced by substantially younger employees (each at least twenty years younger than she), who each had inferior qualifications and experience. As detailed above, Defendants and each of them began supplanting Ms. Barrett with these younger employees in carrying out her duties even before Ms. Barrett was terminated, and on information belief, after her replacement, those younger employees continued to assume her duties. These actions were discriminatory practices by the Defendants and each of them based on Ms. Barrett's age and were designed to limit, segregate, or classify Ms. Barrett in such a way that she was deprived of individual employment opportunities and her status as an employee was adversely affected. As alleged more fully above, Defendants and each of them considered age to be a significant factor in replacing and otherwise discriminating against Ms. Barrett.

133.  Age is not a bona fide occupational qualification reasonably necessary to the normal business operations of Defendants or any of them.

134.  Defendants and each of them have failed to prevent, respond to, adequately investigate, and/or appropriately resolve this age discrimination.

135.  Defendants' and each of their conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of Ms. Barrett, entitling Ms. Barrett to punitive damages.

136.  As a result of Defendants' and each of their conduct alleged in this Complaint, Ms. Barrett has suffered and will continue to suffer harm, including but not limited to, lost earnings and other financial loss, as well as non-economic damages.

137.  By reason of the continuous nature of Defendants' and each of their discriminatory conduct, which persisted throughout Ms. Barrett's employment, the continuing violations doctrine applies to all violations alleged.

138.  By reason of Defendants' and each of their discrimination, Ms. Barrett is entitled to all legal and equitable remedies available for violations of the ADEA.

139.   Attorney's fees should be awarded under 29 U.S.C. § 216(b).

**SIXTH CLAIM FOR RELIEF**

**Retaliation**

**In Violation of the ADEA, 29 U.S.C. § 623(d); 29 U.S.C. § 216(b)**

**Against All Defendant Cushman & Wakefield**

140.   Ms. Barrett re-alleges and incorporates by reference each allegation in the previous paragraphs.

141.   Ms. Barrett engaged in protected activity that included, but is not limited to, complaining to Mr. Campos and Mr. Gilbert about her discriminatorily low pay, which she did on multiple occasions. Ms. Barrett also engaged in protected activity when she retained counsel, who informed Defendants of its representation of Ms. Barrett in her claims prior to Ms. Barrett's termination.

142.   Defendants and each of them engaged in adverse employment actions against Ms. Barrett for engaging in protected activities. These adverse employment actions included subjecting her to materially unfavorable terms and conditions of employment, such as denials of compensation and opportunities afforded to her younger coworkers, and ultimately terminating her.

143.   Defendants' and each of their retaliatory acts against Ms. Barrett were a direct and proximate result of her protected activities.

144.   A reasonable employee would find Defendants' and each of their retaliatory acts materially adverse and such acts would dissuade a reasonable person from making or supporting a charge of discrimination.

145.   Defendants' and each of their conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of Ms. Barrett, entitling her to punitive damages.

146.   As a result of Defendants' and each of their conduct alleged in this complaint, Ms. Barrett has suffered and will continue to suffer harm, including but not limited to lost earnings, lost benefits and other financial loss, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

Costanzo Law Firm
111 W. St. John, Ste. 700
San Jose, CA 95113

COSTANZO LAW FIRM
111 W. ST. JOHN, STE. 700
SAN JOSE, CA 95113

147. Ms. Barrett is entitled to all legal and equitable remedies available for violations of the ADEA, including an award of punitive damages.

148. Attorney's fees and costs should be awarded under 29 U.S.C. § 216(b).

### SEVENTH CLAIM FOR RELIEF

### Denial of Equal Pay

### In Violation of the California Equal Pay Act, Cal. Labor Code § 1197.5, et seq.

### Against All Defendants

149. Ms. Barrett re-alleges and incorporates by reference each allegation in the previous paragraphs.

150. At all relevant times, Ms. Barrett was employed by Defendants and each of them within the meaning of California's Equal Pay Act, Cal. Lab. Code § 1197.5, *et seq*. Cushman & Wakefield has discriminated against Ms. Barrett in violation of the California Equal Pay Act. Defendants and each of them have paid Ms. Barrett, a woman, less than similarly situated male employees on the same team performing substantially similar work on jobs the performance of which requires substantially similar skill, effort, and responsibility, and which are performed under similar working conditions.

151. Defendants and each of them have subjected Ms. Barrett to common discriminatory pay policies, including but not limited to a discriminatory system of determining salaries, commissions payments, bonuses, and other compensation incentives; a discriminatory system for promotions, which results in male and female employees in substantially similar roles performing the same tasks, but receiving different compensation; and other forms of discrimination affecting pay.

152. The differential in pay between Ms. Barrett and the male members of her team was not due to seniority, merit, the quantity or quality of production, or any other bona fide factor. In the alternative, to the extent that Defendants and each of them may have relied upon one or more of these factors, said factor(s) were not reasonably applied and did/do not account for the entire wage differential.

153. Defendants and each of them caused, attempted to cause, contributed to, or caused the continuation of, the wage rate discrimination based on sex. Moreover, the foregoing conduct

constitutes a willful violation of the California Equal Pay Act, Cal. Lab. Code § 1197.5. Therefore, a three-year statute of limitations applies to such violations, pursuant to California Equal Pay Act, Cal. Lab. Code § 1197.5(h).

154.    As a result of Defendants' and each of their conduct alleged in this Complaint and/or Defendants' and each of their willful, knowing, and intentional discrimination, Ms. Barrett has suffered and will continue to suffer harm, including but not limited to lost earnings, lost benefits, and other financial loss, as well as non-economic damages.

155.    Ms. Barrett is therefore entitled to all legal and equitable remedies, including doubled compensatory awards for all willful violations.

156.    Attorney's fees should be awarded under California Labor Code § 1197.5(g), (h).

## EIGHTH CLAIM FOR RELIEF

### Retaliation

### in Violation of California's Equal Pay Act, Cal. Labor Code § 1197.5(k)

### Against All Defendants

157.    Ms. Barrett re-alleges and incorporates by reference each allegation in the previous paragraphs.

158.    At all relevant times, Ms. Barrett was employed by Defendants and each of them within the meaning of California's Equal Pay Act, Ms. Barrett engaged in protected activity under the Equal Pay Act, including but not limited to by complaining to her supervisors Mr. Campos and Mr. Gilbert about her discriminatorily low pay, which she did on multiple occasions.

159.    Defendants and each of them engaged in adverse employment actions against Ms. Barrett for engaging in protected activities. These adverse employment actions included but are not limited to subjecting her to materially unfavorable terms and conditions of employment, such as denials of compensation and opportunities afforded to her male comparators, and ultimately her termination.

160.    Defendants' and each of their retaliatory acts against Ms. Barrett were substantially motivated by her protected activities in pursuit of her right to equal pay.

161.    A reasonable employee would find Defendants' and each of their retaliatory acts

COSTANZO LAW FIRM
111 W. ST. JOHN, STE. 700
SAN JOSE, CA 95113

materially adverse and such acts would dissuade a reasonable person from making or supporting a charge of discrimination.

162. As a result of Defendants' and each of their conduct alleged in this complaint, Ms. Barrett has suffered and will continue to suffer harm, including but not limited to lost earnings, lost benefits and other financial loss, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish. Defendants' and each of their retaliatory conduct was a substantial factor in causing Ms. Barrett's harm.

163. Under California Labor Code § 1197.5(g) and (h), Ms. Barrett is also entitled to liquidated damages, attorney's fees, and other relief.

## NINTH CLAIM FOR RELIEF
### Gender Discrimination
### in Violation of the California FEHA
### Cal. Gov. Code § 12940, *et seq.*
### Against All Defendants

164. Ms. Barrett re-alleges and incorporates by reference each allegation in the previous paragraphs.

165. At all relevant times, Ms. Barrett was employed by Defendants and each of them within the meaning of California's FEHA. Defendants and each of them discriminated against Ms. Barrett in violation of FEHA, by subjecting her to different treatment because and on the basis of her gender, including by engaging in intentional disparate treatment, and by maintaining policies and practices that have an adverse, disparate impact on female employees.

166. Defendants and each of them have engaged in an intentional, company-wide, and systemic policy, pattern, and/or practice of discrimination against Ms. Barrett by, among other things: maintaining a discriminatory system of determining salaries, commissions payments, bonuses, and other compensation incentives; discrimination in assignments; maintaining a discriminatory system of bonus or commission payment allocation; maintaining a discriminatory system for promotions; and other forms of discrimination.

167. These foregoing policies, practices, and/or procedures have produced an unjustified

COSTANZO LAW FIRM
111 W. St. John, Ste. 700
San Jose, CA 95113

COSTANZO LAW FIRM
111 W. ST. JOHN, STE. 700
SAN JOSE, CA 95113

disparate impact on Ms. Barrett with respect to the terms and conditions of her employment.

168.    As a result of this disparate treatment and disparate impact discrimination, Defendants and each of them have has treated Ms. Barrett differently from and less preferentially than similarly situated male employees with respect to compensation, bonus or commissions payments, job assignments, and promotions.

169.    Defendants and each of them have failed to prevent, respond to, adequately investigate, and/or appropriately resolve this gender discrimination.

170.    Defendants' and each of their conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of Ms. Barrett, entitling Ms. Barrett to punitive damages.

171.    As a result of Defendants' and each of their conduct alleged in this Complaint, Ms. Barrett has suffered and will continue to suffer harm, including but not limited to, lost earnings and other financial loss, as well as non-economic damages.

172.    By reason of the continuous nature of Defendants' and each of their discriminatory conduct, which persisted throughout Ms. Barrett's employment, the continuing violations doctrine applies to all violations alleged.

173.    By reason of Defendants' and each of their discrimination, Ms. Barrett is entitled to all legal and equitable remedies available for violations of the FEHA, including reinstatement and an award of compensatory and punitive damages.

174.    Ms. Barrett is entitled to an award of her attorney's fees under California Government Code § 12965(b).

## TENTH CLAIM FOR RELIEF

### Retaliation

### in Violation of FEHA, Cal. Gov. Code § 12940, *et seq*.

### Against All Defendants

175.    Ms. Barrett re-alleges and incorporates by reference each allegation in the previous paragraphs.

176.    At all relevant times, Ms. Barrett was employed by Defendants and each of them

within the meaning of California's FEHA. As an employee, Ms. Barrett engaged in protected activity that included, but is not limited to, complaining to Mr. Campos and Mr. Gilbert about her discriminatorily low pay, which she did on multiple occasions. Ms. Barrett also engaged in protected activity when she retained counsel, who informed Defendants of its representation of Ms. Barrett in her claims prior to Ms. Barrett's termination.

177.    Defendants and each of them engaged in adverse employment actions against Ms. Barrett for engaging in protected activities. These adverse employment actions included subjecting her to materially unfavorable terms and conditions of employment, such as denials of compensation and opportunities afforded to her male comparators, and ultimately terminating her.

178.    Defendants' and each of their retaliatory acts against Ms. Barrett were a direct and proximate result of her protected activities.

179.    A reasonable employee would find Defendants' and each of their retaliatory acts materially adverse and such acts would dissuade a reasonable person from making or supporting a charge of discrimination.

180.    Defendants' and each of their conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of Ms. Barrett, entitling her to punitive damages.

181.    As a result of Defendants' and each of their conduct alleged in this complaint, Ms. Barrett has suffered and will continue to suffer harm, including but not limited to lost earnings, lost benefits and other financial loss, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

182.    Ms. Barrett is entitled to all legal and equitable remedies available for violations of Title VII and the FEHA, including an award of punitive damages.

183.    Ms. Barrett is entitled to recover attorney's fees and costs under California Government Code § 12965(b).

//

//

//

COSTANZO LAW FIRM
111 W. ST. JOHN, STE. 700
SAN JOSE, CA 95113

COSTANZO LAW FIRM
111 W. ST. JOHN, STE. 700
SAN JOSE, CA 95113

**ELEVENTH CLAIM FOR RELIEF**

**Wrongful Termination in Violation of Public Policy**

**Against All Defendants**

184.   Ms. Barrett re-alleges and incorporates by reference each allegation in the previous paragraphs.

185.   At all relevant times, Ms. Barrett was employed by Defendants and each of them. Defendants and each of them subjected Ms. Barrett to working conditions that violated public policies in numerous statutes as described above, in that Ms. Barrett was, *inter alia*, denied equal employment opportunities, compensation, and other terms and conditions of employment that were afforded to her younger and male comparators.

186.   Defendants and each of them intentionally created and knowingly permitted these working conditions.

187.   As alleged more fully above, Ms. Barrett engaged in protected activity by repeatedly reporting and complaining of those working conditions, particularly regarding discriminatorily low pay, as well as by retaining counsel to represent her in her discrimination, equal pay, and retaliation claims.

188.   As alleged more fully above, Defendants and each of them against Ms. Barrett for conduct protected by fundamental and substantial public policies, each of which inures to the public interest and is beneficial for the public and were well-established at all relevant times, and which prohibit termination and retaliation against employees. This protected conduct included but was not limited reporting to her employer and to supervisors with authority to investigate, discovery or correct the violations, her reasonably based suspicions of unlawful discrimination and retaliation in violation of statutes as alleged above, and pursuing her rights to equal pay and/or to a working environment free of unlawful discrimination and harassment protected by statutes as alleged above.

189.   Ms. Barrett's protected conduct was a substantial motivating reason for Defendants' and each of their adverse employment actions against Ms. Barrett and termination of her employment. For example, upon Ms. Barrett's complaints and upon receiving notice that she was represented by counsel, in violation of the public policies supported by the FLSA as amended by the DPA, Title VII,

the ADEA, California's Equal Pay Act, FEHA, and/or California Labor Code § 1102.5, Cushman & Wakefield subjected her to adverse employment actions and terminated Ms. Barrett's employment in retaliation for Ms. Barrett engaging in protected activity.

190.    The adverse employment actions, including subjecting Ms. Barrett to discriminatory and retaliatory working conditions, as well as retaliatory termination, were a proximate cause of and a substantial factor in causing Ms. Barrett's harm, including lost past and future earnings and other employment benefits, humiliation, embarrassment, and mental anguish in an amount to be established at trial, and in excess of the jurisdictional minimum.

191.    Defendants' and each of their wrongful termination was also a substantial factor in causing Ms. Barrett to suffer general and special damages in sums according to proof.

192.    Defendants' and each of their wrongful termination of Ms. Barrett's employment was done intentionally, in a malicious, fraudulent, oppressive, fraudulent manner. Defendants and each of them despicably subjected Ms. Barrett to cruel and unjust hardship in conscious disregard of her rights, ostracizing Ms. Barrett and purporting to have terminated Ms. Barrett upon pretextual reasons. Ms. Barrett is entitled to punitive damages in an amount appropriate to punish defendant and deter others from engaging in similar misconduct.

193.    Ms. Barrett has incurred and continues to incur legal expenses and attorney's fees. Under California Code of Civil Procedure §§ 1021.5 and 1032, *et seq*., Ms. Barrett is entitled to recover reasonable attorney's fees and costs in an amount according to proof.

### TWELFTH CLAIM FOR RELIEF

### Breach of Contract

### Against All Defendants

194.    Ms. Barrett re-alleges and incorporates by reference each allegation in the previous paragraphs.

195.    Upon her hiring in 2016, Ms. Barrett discussed her employment and compensation agreements and arrangements with Mr. Campos and Mr. Gilbert, who had authority to bind the Company on this matter, at length, resulting in a partially written and partially oral agreement with Defendants and each of them that Ms. Barrett's annual bonus would amount to just under one third

COSTANZO LAW FIRM
111 W. ST. JOHN, STE. 700
SAN JOSE, CA 95113

of the team's overall commissions payments, and would not be offset by her salary, expenses, or any other sum. In the alternative, this agreement was with Mr. Campos (including individually and through the instrumentality of Campos Real Estate Advisory, Inc.) and Mr. Gilbert and enforceable against them and each of them.

196.   Cushman & Wakefield, Mr. Campos, and Mr. Gilbert, and each of them, agreed to her compensation arrangement as described in the paragraphs above, and received profits in which, by the terms of her contracts, the employee was entitled to share.

197.   At all times, Ms. Barrett performed all conditions, covenants, and promises required to be performed on his part in accordance with the express and implied terms of her employment agreement and Compensation Agreement, and to the extent she did not, such nonperformance was excused or waived.

198.   Defendants and each of them breached this agreement with Ms. Barrett, as alleged more fully above, including but not limited to by denying her bonus payments that even came close to approximating the rate and amount they had agreed upon, by not providing her with the assigned goals and objectives by which her annual bonus award was to be determined and to which she was entitled under her Employment Agreement, and by terminating her employment to avoid paying her amounts to which she was entitled.

199.   As a direct and foreseeable result of the breaches of contract, Ms. Barrett has suffered and continue to suffer harm and is entitled to compensatory damages in an amount according to proof.

### THIRTEENTH CLAIM FOR RELIEF

### Breach of the Implied Covenant of Good Faith and Fair Dealing

### Against All Defendants

200.   Ms. Barrett re-alleges and incorporates by reference each allegation in the previous paragraphs.

201.   As alleged more fully above, Ms. Barrett, on the one hand, and Defendants and each of them, on the other, entered into a valid oral agreement that Ms. Barrett's annual bonus would amount to just under one third of the team's overall commissions payments, and would not be offset by her salary, expenses, or any other sum. Additionally, Ms. Barrett and Defendants and each of them

COSTANZO LAW FIRM
111 W. ST. JOHN, STE. 700
SAN JOSE, CA 95113

1    had a valid and enforceable written employment agreement ("Employment Agreement").

2        202.    These agreements each contained an implied covenant of good faith and fair dealing
3    that obligated Defendants and each of them to perform the terms and conditions of the agreement
4    fairly and in good faith and to refrain from acting in ways that would deprive Ms. Barrett of its
5    benefits. For example, the Employment Agreement gave Mr. Campos and Mr. Gilbert discretion to
6    determine the details of the payments made to Ms. Barrett and to reach an arrangement with authority
7    to bind the Company that would conform to the reasonable expectations of Ms. Barrett. Defendants
8    and each of them were obligated to exercise this discretion in good faith, and therefore to create an
9    arrangement that would result in Ms. Barrett receiving as a bonus close to one third of the
10   commissions payments brought in by her team. Defendants also, e.g., breached the implied covenant
11   by not providing her with the assigned goals and objectives by which her annual bonus award was to
12   be determined and to which she was entitled under her Employment Agreement; by not providing
13   her accurate and timely information about amounts collected and calculations of her award, but
14   instead providing her with false, inaccurate, and changing information; excluding her from accounts,
15   transactions and opportunities to exclude her from sharing in their gains; depriving her of the fruits
16   of the agreements; and by terminating her employment in bad faith to avoid paying her amounts to
17   which she was entitled.

18       203.    As alleged above, at all times, Ms. Barrett performed all conditions, covenants, and
19   promises required on her part in accordance with the terms of each agreement.

20       204.    In breach of the covenant of good faith and fair dealing arising from each agreement,
21   Defendants and each of them acted in bad faith by intentionally denying Ms. Barrett the benefits that
22   the parties expected she would receive under the respective agreement.

23       205.    As a direct and foreseeable result of Defendants' and each of their failure to act in
24   good faith under the terms of the Compensation Agreement and Employment Agreement, Ms. Barrett
25   has suffered and continues to suffer harm and is entitled to compensatory damages according to proof.

26   //
27   //
28   //

COSTANZO LAW FIRM
111 W. ST. JOHN, STE. 700
SAN JOSE, CA 95113

COSTANZO LAW FIRM
111 W. ST. JOHN, STE. 700
SAN JOSE, CA 95113

**FOURTEENTH CLAIM FOR RELIEF**

**Breach of Fiduciary Duty**

**Against Defendants Raul Campos, Kenneth Gilbert, Campos Real Estate Advisory, Inc. and Does 1–50 and Roes 51–100**

206.   In or around January 2016, as alleged more fully above Mr. Campos (including individually and through the instrumentality of Campos Real Estate Advisory, Inc.) and Mr. Gilbert had a joint venturers and/or partnership agreement with Ms. Barrett.

207.   As joint venturers and/or partners with Ms. Barrett, Mr. Campos (including individually and through the instrumentality of Campos Real Estate Advisory, Inc.) and Mr. Gilbert and each of them owed Ms. Barrett fiduciary duties including of care and loyalty and to act with the utmost good faith in the best interests of Ms. Barrett as their joint venturer and/or partner.

208.   They also had these duties because of the relationship of trust and confidence which Ms. Barrett imposed in them, and each of them, and in their and each of their integrity, which they and each of them voluntarily accepted and assumed by accepting on the team, partnership and/or joint venture's behalf the profits to be distributed on their transactions and accounts, as of all the accounting and documentation information about what those amounts were and when they were paid, collected, and received from the clients, and on behalf of the team, partnership and/or joint venture.

209.   As alleged more fully above, they and each of them breached their fiduciary duties, by, among other breaches:

A.   Failing and refusing to pay Ms. Barrett timely for the share they had all agreed to in receipts and profits of their team, partnership and/or joint venture's annual transactions;

B.   Failing and refusing to pay Ms. Barrett for amount of the share they had all agreed to in the receipts and profits of their team, partnership and/or joint venture's annual transactions;

C.   Failing and refusing to provide Ms. Barrett with accurate and timely information about the receipts and profits earned, including but not limited figures and documentation of when and in what amounts those were received

COSTANZO LAW FIRM
111 W. ST. JOHN, STE. 700
SAN JOSE, CA 95113

1    from clients, when and in what amounts those were distributed to Defendants

2    on behalf of the team, partnership and/or joint venture; and when, to whom,

3    and in what amounts Defendants further distributed what they had received.

4    D.    Providing Ms. Barrett instead with inaccurate, falsified, and/or misleading

5    information;

6    E.    Failing and refusing to use deal fairly, honestly, and with the utmost punctilio

7    of honesty and good faith with Ms. Barrett in connection with certain accounts

8    and transactions as alleged more fully above;

9    F.    Failing and refusing to act in Ms. Barrett's interest in connection with certain

10    accounts and transactions as alleged more fully above and excluding her from

11    sharing in the gain;

12    G.    Failing and refusing to act in Ms. Barrett's interest in connection with the joint

13    venture and/or partnership as alleged more fully above; and

14    H.    Taking unfair advantage of Ms. Barrett, including in misappropriating assets

15    and funds which should have been distributed to Ms. Barrett and secretly

16    enriching themselves and each of themselves at Ms. Barrett's expense;

17    I.    Ms. Barrett did not give informed consent to such misconduct, and was

18    harmed, and Defendants' and each of their conduct was a substantial factor in

19    causing her harm. She is entitled to recover damages that will reasonably

20    compensate her for this harm. She is also entitled to an accounting,

21    constructive trust, and all other equitable remedies necessary to permit Ms.

22    Barrett to trace and recover assets and funds misappropriated by Defendants'

23    and each of their fraud, violation of trust and wrongful conduct.

24    210.    Defendants' and each of their misconduct was also intentional, deliberate, willful,

25    malicious, oppressive, reckless, and conducted in callous disregard of Ms. Barrett's rights and with

26    knowing disregard of the consequences to Ms. Barrett. They acted with vile, base, and contemptible

27    trickery, deceit, and as part of a pattern or practice of intentional misrepresentations and withholding

28    of information and funds and assets, with intent to harm and mislead Ms. Barrett and take advantage

of her and financial vulnerability, while knowing the harm that was likely to occur, that was that it would be looked down upon by reasonable people. Accordingly, Ms. Barrett is entitled to punitive damages in an amount sufficient to punish and deter such despicable conduct.

**FIFTEENTH CLAIM FOR RELIEF**

**Fraud**

**Against All Defendants**

211.   Ms. Barrett re-alleges and incorporates by reference each allegation in the previous paragraphs.

212.   In or around January 2016, as alleged more fully above, Defendants, and each of them, made a promise to Ms. Barrett, as alleged more fully above, that Ms. Barrett's annual bonus would amount to just under one third of the team's overall commissions payments, and would not be offset by her salary, expenses, or any other sum.

213.   As alleged more fully above, Defendants, and each of them, did not intend to perform this promise when it made it and did not, in fact, perform this promise.

214.   However, Defendants, and each of them, intended that Ms. Barrett rely on this promise; and Ms. Barrett did, in fact, reasonably rely on this promise, to her detriment: the false promise substantially influence Ms. Barrett decided to forgo another arrangement that would have involved different compensation structure and to remain and continue working and performing in lieu of seeking other opportunities elsewhere. She would not have done so without the false promise.

215.   Ms. Barrett was harmed and her reliance on Defendants' and each of their promise was a substantial factor in causing her harm. She is entitled to recover damages that will reasonably compensate her for the harm and for amounts she spent in reliance on the false promise. She is also entitled to an accounting, constructive trust, and all other equitable remedies necessary to permit Ms. Barrett to trace and recover assets and funds misappropriated by Defendants' and each of their fraud, violation of trust and wrongful conduct.

216.   Defendants' and each of their misconduct was also intentional, deliberate, willful, malicious, oppressive, reckless, and conducted in callous disregard of Ms. Barrett's rights and with knowing disregard of the consequences to Ms. Barrett. Moreover, one or more officers, directors, or

managing agents of Cushman & Wakefield knew of conduct constituting malice, oppression, or fraud, with vile, base, and contemptible trickery, deceit, and a pattern or practice of intentional false promises, with intent to harm and mislead Ms. Barrett and take advantage of her and financial vulnerability, while knowing the harm that was likely to occur, that was that it would be looked down upon by reasonable people. Knowing of this vile, base, and contemptible conduct, one or more officers, directors, or managing agents of Cushman & Wakefield still adopted or approved that conduct after it occurred. Accordingly, Ms. Barrett is entitled to punitive damages in an amount sufficient to punish and deter such despicable conduct.

## VII.   PRAYER FOR RELIEF

217.   WHEREFORE, Ms. Barrett prays that this Court enter an award in favor of Ms. Barrett and against Defendants, and each of them, for:

A.   back pay, front pay, lost benefits, preferential rights to jobs, and other damages for lost compensation and job benefits suffered by Ms. Barrett in an amount to be proven at trial;

B.   nominal, liquidated, and compensatory damages in an amount to be proven at trial;

C.   punitive damages as allowed by law;

D.   all pre-judgment interest and post-judgment interest available under law;

E.   penalties available under all applicable laws;

F.   orders requiring Defendant to make Ms. Barrett whole by providing her with any other monetary and affirmative relief;

G.   Ms. Barrett's litigation costs and expenses, including, but not limited to, attorney's fees and costs related to her prosecution of this action;

H.   any other appropriate equitable and non-monetary relief, including but not limited to reinstatement; corrective training; and new, corrected, and/or modified policies and procedures as permitted by law as well as constructive trust and accounting; and

I.   Such additional and further relief as this Court may deem just and proper.

COSTANZO LAW FIRM
111 W. ST. JOHN, STE. 700
SAN JOSE, CA 95113

## VIII.   <u>JURY DEMAND</u>

Ms. Barrett demands a trial by jury on all issues triable by jury

Dated:   September 14, 2021

Costanzo Law Firm, APC

<u>/s/Lori J. Costanzo</u>
Lori J. Costanzo
Lucy Goodnough
Mallory Barr

Attorneys for Plaintiff Sharon Barrett

# EXHIBIT "1"

EEOC Form 161-B (11/2020)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## NOTICE OF RIGHT TO SUE *(ISSUED ON REQUEST)*

| To: | **Sharon G. Barrett**<br>**P.O. 2921**<br>**Edwards, CO 81632** | From: | **San Francisco District Office**<br>**450 Golden Gate Avenue**<br>**5 West, P.O. Box 36025**<br>**San Francisco, CA 94102** |
|---|---|---|---|

☐ *On behalf of person(s) aggrieved whose identity is*
*CONFIDENTIAL (29 CFR §1601.7(a))*

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| **550-2019-01735** | **Warren S. Chen,**<br>**Investigator** | **(650) 684-0946** |

*(See also the additional information enclosed with this form.)*

**NOTICE TO THE PERSON AGGRIEVED:**

**Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act (ADA), or the Genetic Information Nondiscrimination Act (GINA):** This is your Notice of Right to Sue, issued under Title VII, the ADA or GINA based on the above-numbered charge.  It has been issued at your request.  Your lawsuit under Title VII, the ADA or GINA **must be filed in a federal or state court WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost.  (The time limit for filing suit based on a claim under state law may be different.)

☒ More than 180 days have passed since the filing of this charge.

☐ Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of this charge.

☒ The EEOC is terminating its processing of this charge.

☐ The EEOC will continue to process this charge.

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge.  In this regard, **the paragraph marked below applies to your case:**

☒ The EEOC is closing your case.  Therefore, your lawsuit under the ADEA **must be filed in federal or state court WITHIN 90 DAYS of your receipt of this Notice.**  Otherwise, your right to sue based on the above-numbered charge will be lost.

☐ The EEOC is continuing its handling of your ADEA case.  However, if 60 days have passed since the filing of the charge, you may file suit in federal or state court under the ADEA at this time.

**Equal Pay Act (EPA):**  You already have the right to sue under the EPA (filing an EEOC charge is not required.)  EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment.  This means that **backpay due for any violations that occurred more than 2 years (3 years)** before you file suit may not be collectible.

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

Enclosures(s)          for

**William R. Tamayo,**
**District Director**

*(Date Issued)*

cc: | **Alex C. Weinstein**<br>**VEDDER PRICE**<br>**222 North Lasalle Street**<br>**Chicago, IL 60601** | **Gilbert, Felicia**<br>**Sanford Heisler Sharp, LLP**<br>**111 Sutter Street, Suite 975**<br>**San Francisco, CA 94104** |

Enclosure with EEOC
Form 161-B (11/2020)

# INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court <u>under Federal law</u>.
If you also plan to sue claiming violations of State law, please be aware that time limits and other
provisions of State law may be shorter or more limited than those described below.)*

**PRIVATE SUIT RIGHTS    --    Title VII of the Civil Rights Act, the Americans with Disabilities Act (ADA),
the Genetic Information Nondiscrimination Act (GINA), or the Age
Discrimination in Employment Act (ADEA):**

In order to pursue this matter further, you must file a lawsuit against the respondent(s) named in the charge **within
90 days of the date you *receive* this Notice**.  Therefore, you should **keep a record of this date**.  Once this 90-
day period is over, your right to sue based on the charge referred to in this Notice will be lost.  If you intend to
consult an attorney, you should do so promptly.  Give your attorney a copy of this Notice, and its envelope or
record of receipt, and tell him or her the date you received it.  Furthermore, in order to avoid any question that you
did not act in a timely manner, it is prudent that your suit be filed **within 90 days of the date this Notice was
*issued* to you** (as indicated where the Notice is signed) or the date of the postmark or record of receipt, if later.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction.  (Usually, the appropriate
State court is the general civil trial court.)  Whether you file in Federal or State court is a matter for you to decide
after talking to your attorney.  Filing this Notice is not enough.  You must file a "complaint" that contains a short
statement of the facts of your case which shows that you are entitled to relief.  Your suit may include any matter
alleged in the charge or, to the extent permitted by court decisions, matters like or related to the matters alleged in
the charge.  Generally, suits are brought in the State where the alleged unlawful practice occurred, but in some
cases can be brought where relevant employment records are kept, where the employment would have been, or
where the respondent has its main office.  If you have simple questions, you usually can get answers from the
office of the clerk of the court where you are bringing suit, but do not expect that office to write your complaint or
make legal strategy decisions for you.

## PRIVATE SUIT RIGHTS    --    Equal Pay Act (EPA):

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment: back
pay due for violations that occurred **more than 2 years (3 years) before you file suit** may not be collectible.  For
example, if you were underpaid under the EPA for work performed from 7/1/08 to 12/1/08, you should file suit
<u>before 7/1/10</u> – *not* 12/1/10 -- in order to recover unpaid wages due for July 2008.  This time limit for filing an EPA
suit is separate from the 90-day filing period under Title VII, the ADA, GINA or the ADEA referred to above.
Therefore, if you also plan to sue under Title VII, the ADA, GINA or the ADEA, in addition to suing on the EPA
claim, suit must be filed within 90 days of this Notice <u>and</u> within the 2- or 3-year EPA back pay recovery period.

## ATTORNEY REPRESENTATION    --    Title VII, the ADA or GINA:

If you cannot afford or have been unable to obtain a lawyer to represent you, the U.S. District Court having jurisdiction
in your case may, in limited circumstances, assist you in obtaining a lawyer.  Requests for such assistance must be
made to the U.S. District Court in the form and manner it requires (you should be prepared to explain in detail your
efforts to retain an attorney).  Requests should be made well before the end of the 90-day period mentioned above,
because such requests do <u>not</u> relieve you of the requirement to bring suit within 90 days.

## ATTORNEY REFERRAL AND EEOC ASSISTANCE    --    All Statutes:

You may contact the EEOC representative shown on your Notice if you need help in finding a lawyer or if you have any
questions about your legal rights, including advice on which U.S. District Court can hear your case.  If you need to
inspect or obtain a copy of information in EEOC's file on the charge, please request it promptly in writing and provide
your charge number (as shown on your Notice).  While EEOC destroys charge files after a certain time, all charge files
are kept for at least 6 months after our last action on the case.  Therefore, if you file suit and want to review the charge
file, **please make your review request <u>within 6 months</u> of this Notice**.  (Before filing suit, any request should be
made within the next 90 days.)

***IF YOU FILE SUIT, PLEASE SEND A COPY OF YOUR COURT COMPLAINT TO THIS OFFICE.***

**EXHIBIT "2"**



300 Santana Row
5th Floor
San Jose, CA 95128
Tel   +1 408 615 3400
Fax   +1 408 615 3444
cushmanwakefield.com

January 5, 2016

Ms. Sharon Barrett

Dear Sharon:

We are pleased to extend you an offer for employment with Cushman & Wakefield. We strive to create an energizing workplace and empower our employees to grow professionally. We're confident your experience at Cushman & Wakefield will be challenging and fulfilling. Please read below for the complete terms of our employment offer.

| | |
|---|---|
| Position: | Senior Vice President (Exempt); see attached job description |
| Effective Date: | January 11, 2016 |
| Reports to: | Raul Campos |
| Salary: | $200,000.00 annual base salary |
| Employing Entity: | You are being hired as an employee of Cassidy Turley Commercial Real Estate Services, Inc., d/b/a Cushman & Wakefield. |
| Bonus Target: | You will be eligible for a discretionary annual bonus award to be determined by Raul Campos and Ken Gilbert based on assigned goals/objectives.  Bonus payments are contingent upon company and service line profitability and in all cases, are paid at the sole discretion of the Company. Should your salary or bonus target change during the performance year, it will be prorated accordingly. Cushman & Wakefield bonuses are presently paid in March of the succeeding year, but the Company reserves the right to change this date as it deems appropriate. An express condition of earning said bonus is continued employment through the bonus payment date, as allowed by state and federal law. Should employee leave employment for any reason prior to the bonus payment date, no bonus will have been earned and will not be payable as allowed by state and federal law. |
| Previous Draw Balance: | Cushman & Wakefield has agreed to release you from any outstanding debt of that was incurred during your previous employment with Cushman & Wakefield in the form of a draw. |
| Benefits: | As a full-time employee, you will have access to company provided benefits as defined by the applicable summary plan descriptions and company policy. Additional details regarding benefit eligibility and options is defined further in the attached benefit summary.  The Company reserves the right to modify any of its benefits, including the health and welfare plan, or terminate benefit options, any time at the Company's sole discretion and without prior notice. |
| Contingencies: | This offer and your continued employment are contingent upon satisfactory results on a background investigation and reference check at the Company's expense. This includes, but is not limited to, a satisfactory criminal record check and drug screening, which must be completed within 48 hours. You are advised not to resign or leave your current employer or turn down other employment opportunities until notified that you have satisfactorily passed the background investigation and reference check. |

Ms.Sharon Barrett
January 5, 2016
Page 2

| | |
|---|---|
| **Employment At-Will:** | Your employment with Cushman & Wakefield will be as an employee at-will, which means that either you or Cushman & Wakefield may terminate the employment relationship at any time with or without notice or cause. Also, like all employees, you will be expected to abide by the Company's rules and standards, including by acknowledging receipt of the Company's Employee Handbook. Policies contained therein are subject to modification as deemed necessary by the Company. |
| **Verification of Right to Work:** | Federal law requires the Company to verify U.S. work authorization upon date of hire. This job offer is contingent upon the presentation of materials verifying your right to work in the U.S. On your first day of work, please bring with you documents verifying your identity and work authorization (for example, a passport or driver's license, and your social security card or birth certificate). If you do not have these documents, please contact me before your start date. Failure to present appropriate documentation may result in the withdrawal of this job offer. |
| **Confidentiality:** | The protection of confidential information and trade secrets is essential for Cushman & Wakefield for both its company's and employees' future security. To protect such information, employees may not disclose any trade secrets or confidential information (defined further in the Employee Handbook). The Company's Confidentiality Policy is ongoing even after employment with the Company terminates. In addition, Cushman & Wakefield recognizes that you may have information belonging to another company or entity, including any prior employer. Cushman & Wakefield specifically requests that you do not use, upload, copy or bring with you to Cushman & Wakefield any information from any other company or entity, including any prior employer. Any violations of this request may result in discipline, up to and including, termination. |
| **Non-Solicitation:** | In order to preserve the confidentiality of the information referred to in the "Confidentiality" paragraph above, and to protect Cushman & Wakefield's legitimate interests in their client relationships and goodwill you agree that, for a period of twelve (12) months following the termination of your relationship with Cushman & Wakefield, subject to applicable law, you will not: |

- solicit, or attempt to solicit, any employee or independent contractor of the Company to participate in any Competing Business as an employee, independent contractor, officer, director, advisor, consultant or owner. The term "Competing Business" shall mean any entity engaged in or planning to engage in the Company's Business or any part thereof;
- interfere in any way with the relationship between the Company and any employee, agent or independent contractor of the Company;
- solicit, or attempt to solicit, any business from any entity or person for whom the Company has provided, or you or the Company negotiated or prepared to negotiate to provide, such business within one (1) year prior to the termination of your employment;
- interfere, or attempt to interfere, in any way with the relationship between the Company and any supplier or vendor, or use information regarding any such supplier or vendor in any way to the detriment of the Company.

Your signature on this offer letter indicates your acknowledgment and acceptance of the provisions set forth above as the full and complete statement of the terms and conditions of your employment with the Company. Any changes to the terms and conditions set forth in this letter must be in writing and signed by both parties.

This offer is effective through January 6, 2016. Please execute one copy of this letter and return it to me by January 6, 2016. If we do not receive the letter or a response by that date, the offer will be effectively rescinded.

Ms.Sharon Barrett
January 5, 2016
Page 3

If you have any questions or if I can provide you with further information, please do not hesitate to contact me. On behalf of all of us at Cushman & Wakefield, we are excited that you have joined us, and we hope that you find your association with our company to be challenging and fulfilling in every respect.

Sincerely,

*Tammi Blundo*

Tammi Blundo
Vice President, Human Resources

_____          1/5/2016
Sharon Barrett                                     Date


**CUSHMAN & WAKEFIELD**

# Candidate Referral Form

**New Employee Name:** _Sharon Barrett_

**Department:** _Solutions Group_

**Location:** _San Francisco_

**From what source did you learn of the available position?**

☐ Current Employee
   Name of Employee: _____

☐ External Job Board
   Name of Job Board: _____

☐ Professional Organization
   Name of Organization: _____

☐ Company Website

☐ News Publication

☐ Recruiting Agency

☐ University Recruiting
   Name of University: _____

☒ Other
   List other source: _Mike Smith_

I certify the above information I have provided is accurate.

Signature: _____          Date: _1/5/2016_

# New Health Insurance Marketplace Coverage
# Options and Your Health Coverage

Form Approved
OMB No. 1210-0149
(expires 1-31-2017)

## PART A: General Information

When key parts of the health care law take effect in 2014, there will be a new way to buy health insurance: the Health Insurance Marketplace. To assist you as you evaluate options for you and your family, this notice provides some basic information about the new Marketplace and employment-based health coverage offered by your employer.

### What is the Health Insurance Marketplace?

The Marketplace is designed to help you find health insurance that meets your needs and fits your budget. The Marketplace offers "one-stop shopping" to find and compare private health insurance options. You may also be eligible for a new kind of tax credit that lowers your monthly premium right away. Open enrollment for health insurance coverage through the Marketplace begins in October 2013 for coverage starting as early as January 1, 2014.

### Can I Save Money on my Health Insurance Premiums in the Marketplace?

You may qualify to save money and lower your monthly premium, but only if your employer does not offer coverage, or offers coverage that doesn't meet certain standards. The savings on your premium that you're eligible for depends on your household income.

### Does Employer Health Coverage Affect Eligibility for Premium Savings through the Marketplace?

Yes. If you have an offer of health coverage from your employer that meets certain standards, you will not be eligible for a tax credit through the Marketplace and may wish to enroll in your employer's health plan. However, you may be eligible for a tax credit that lowers your monthly premium, or a reduction in certain cost-sharing if your employer does not offer coverage to you at all or does not offer coverage that meets certain standards. If the cost of a plan from your employer that would cover you (and not any other members of your family) is more than 9.5% of your household income for the year, or if the coverage your employer provides does not meet the "minimum value" standard set by the Affordable Care Act, you may be eligible for a tax credit.[1]

**Note:** If you purchase a health plan through the Marketplace instead of accepting health coverage offered by your employer, then you may lose the employer contribution (if any) to the employer-offered coverage. Also, this employer contribution —as well as your employee contribution to employer-offered coverage– is often excluded from income for Federal and State income tax purposes. Your payments for coverage through the Marketplace are made on an after-tax basis.

### How Can I Get More Information?

For more information about your coverage offered by your employer, please check your summary plan description or contact ____HR Benefits- 877.464.5633 or hr-benefits@cassidyturley.com_____.

The Marketplace can help you evaluate your coverage options, including your eligibility for coverage through the Marketplace and its cost. Please visit HealthCare.gov for more information, including an online application for health insurance coverage and contact information for a Health Insurance Marketplace in your area.

---

[1] An employer-sponsored health plan meets the "minimum value standard" if the plan's share of the total allowed benefit costs covered by the plan is no less than 60 percent of such costs.

## PART B: Information About Health Coverage Offered by Your Employer

This section contains information about any health coverage offered by your employer. If you decide to complete an application for coverage in the Marketplace, you will be asked to provide this information. This information is numbered to correspond to the Marketplace application.

| 3. Employer name | 4. Employer Identification Number (EIN) |
|---|---|
| Cassidy Turley Commercial Real Estate Services, Inc. dba Cushman & Wakefield | 43-0955234 |

| 5. Employer address | 6. Employer phone number |
|---|---|
| 55 Westport Plaza, Suite 600 | 877.464.5633 |

| 7. City | 8. State | 9. ZIP code |
|---|---|---|
| St. Louis | MO | 63146 |

**10. Who can we contact about employee health coverage at this job?**
HR Benefits: hr-benefits@cassidyturley.com or 877.464.5633

| 11. Phone number (if different from above) | 12. Email address |
|---|---|
| | hr-benefits@cassidyturley.com |

Here is some basic information about health coverage offered by this employer:
- As your employer, we offer a health plan to:
  - ☐ All employees.  Eligible employees are:

  - ☒ Some employees. Eligible employees are:
    Employees and QREA's (1099 Unincorporated Brokers) working 30+ hours a week

- With respect to dependents:
  - ☒ We do offer coverage. Eligible dependents are:

    Legal Spouse                    Children up to the end of the calendar year in which the child turns 26
    Disabled Dependent          Same sex domestic partner and children of domestic partner

  - ☐ We do not offer coverage.

☒ If marked, this coverage meets the minimum value standard, and the cost of this coverage to you is intended to be affordable, based on employee wages.

** Even if your employer intends your coverage to be affordable, you may still be eligible for a premium discount through the Marketplace. The Marketplace will use your household income, along with other factors, to determine whether you may be eligible for a premium discount. If, for example, your wages vary from week to week (perhaps you are an hourly employee or you work on a commission basis), if you are newly employed mid–year, or if you have other income losses, you may still qualify for a premium discount.

If you decide to shop for coverage in the Marketplace, HealthCare.gov will guide you through the process. Here's the employer information you'll enter when you visit HealthCare.gov to find out if you can get a tax credit to lower your monthly premiums.

The information below corresponds to the Marketplace Employer Coverage Tool. Completing this section is optional for employers, but will help ensure employees understand their coverage choices.

**13. Is the employee currently eligible for coverage offered by this employer, or will the employee be eligible in the next 3 months?**

☑ **Yes** (Continue)
13a. If the employee is not eligible today, including as a result of a waiting or probationary period, when is the employee eligible for coverage?_____ (mm/dd/yyyy) (Continue)
☐ **No** (STOP and return this form to employee)

14. Does the employer offer a health plan that meets the minimum value standard*?
☑ Yes (Go to question 15)   ☐ No (STOP and return form to employee)

15. For the lowest-cost plan that meets the minimum value standard* **offered only to the employee** (don't include family plans): If the employer has wellness programs, provide the premium that the employee would pay  if  he/ she received the  maximum discount for any tobacco cessation programs, and didn't receive any other discounts based on wellness programs.**
a. How much would the employee have to pay in premiums for this plan?  $_____
b. How often?  ☐ Weekly   ☐ Every 2 weeks   ☐ Twice a month   ☐ Monthly   ☐ Quarterly   ☐ Yearly

If the plan year will end soon and you know that the health plans offered will change, go to question 16. If you don't know, STOP and return form to employee.

16. What change will the employer make for the new plan year?**_____
☐ Employer won't offer health coverage
☐ Employer will start offering health coverage to employees or change the premium for the lowest-cost plan available only to the employee that meets the minimum value standard.* (Premium should reflect the discount for wellness programs. See question 15.)
a. How much would the employee have to pay in premiums for this plan?  $_____
b. How often?  ☐ Weekly   ☐ Every 2 weeks   ☐ Twice a month   ☐ Monthly   ☐ Quarterly   ☐ Yearly

**Please refer to DTZ's 2015 Open Enrollment communication for cost information for #15 and #16 above.

---

• An employer–sponsored health plan meets the "minimum value standard" if the plan's share of the total allowed benefit costs covered by the plan is no less than 60 percent of such costs (Section 36B(c)(2)(C)(ii) of the Internal Revenue Code of 1986)



1000 Aviara Parkway
Suite 100
Carlsbad, CA  92011
Tel: 760.431.4200
Fax: 760.454.3869
cushmanwakefield.com

# Welcome

We are very excited that you have made the decision to join Cushman & Wakefield!

You have joined a team of professionals dedicated to consistently delivering solutions that produce superior results and champion our client's goals. We become our client's partner and advocate, and are passionate about achieving long-term success on their behalf by attracting and retaining the best people. It is our hope that as an employee of Cushman & Wakefield you will find a rewarding working environment.

I have attached the essential paperwork needed to get you set up in our HR system, ePeople. The documents in the **"1. NH Paperwork (Return)"** folder will need to be returned by January 6, 2016. I can receive scanned documents in lieu of originals so please complete and return the documents to me as soon as possible. The only form we MUST receive the original copy of is the I-9 form, which you will need to bring to work with you on your first day, along with your identification.

The folder in the New Hire Packet labeled **"2. NH Paperwork (Return 1st Day)"** contains additional pertinent information that is not needed prior to your start date. The third folder, **"3. NH Paperwork (Reference)"** is for your review and reference.

As previously mentioned above, on your first day of employment, you will be <u>required</u> to complete an Employment Eligibility Verification Form (I-9) and will need to show identification.  Choose which document(s) you wish to provide (a list of acceptable documents can be found on the final page of the I-9 form in your new hire packet) as proof of identity as well as employment eligibility and bring with you.  **It is imperative that you bring identification from List A only or one piece of identification from List B AND on piece of identification from List C on your first day of employment.**

If you need any assistance or have any questions completing the packet, please contact me.

**Cushman & Wakefield**
1000 Aviara Parkway, Suite 100
Carlsbad, CA 92011
**T** 858.625.5262 **F** 760.454.3869
Sarah.Peevey@cushwake.com
www.cushmanwakefield.com

Again, we welcome you and look forward to working with you.

Sincerely,

Sarah Peevey
Sr. Coordinator, Human Resources



**Full-Time Employees**

# ePeople Guide

All employee information is housed in an easy-to-use self-service system called, ePeople.

**ePeople URL:** https://epeople.erpcre.com
**Username:** firstname.lastname (your network log in)
**Password:** your current network password

Please log in to ePeople to complete the following:

- **Elect withholdings on your federal tax form**
  *Navigation: Main Menu>Self Service>Payroll & Compensation>W-4 Tax Information*
  *(If you do not designate your federal tax elections, your withholdings will default to single and 0)*

- **Complete information for direct deposit account(s)**
  *Navigation: Main Menu>Self Service>Payroll & Compensation>Direct Deposit*
  *(Your direct deposit will not be active until account confirmation is sent to HR-Payroll@cassidyturley.com)*

- **Review and verify personal information such as name, address, etc.** (make changes, if necessary)
  *Navigation: Main Menu>Self Service>Personal Information*

- **Add emergency contacts**
  *Navigation: Main Menu>Self Service>Personal Information>Emergency Contacts*

- **Add license/certification information (if applicable)**
  *Navigation: Main Menu>Self Service>Learning & Development>My Current Profile>License & Certifications*

- **Enter Timesheet (if applicable)**
  *Navigation: Main Menu>Self Service>Time Reporting> Report Time > Timesheet*
  *(If you receive an error please email HR-Payroll@cassidyturley.com)*

- **Select your benefit elections \*\***
  *Log* into ePeople and select the *Benefits Enrollment & Change* option or
  *Navigation: Main Menu>Self Service>Benefits>Benefits Enrollment> Click Select on New Hire Event*

Beginning on your first date of full-time employment, you will access your benefit enrollment form in ePeople accessible via our company intranet, eCommunity. eCommunity is the Legacy Cassidy Turley / DTZ intranet, containing valuable employee information and forms. Though we are operating under one brand and doing business as Cushman & Wakefield, your benefit options will be that of the Legacy Cassidy Turley / DTZ organization, until such time we have consolidated benefit platforms.

You must complete your enrollment form within your first 31 days of employment in order to participate in DTZ Benefits. Benefits are subject to change during the next open enrollment period. For benefit questions, contact your HR Business Partner or call the HR Benefit Hotline at 877.464.5633 or HR-benefits@cassidyturley.com

Sign below to acknowledge you have received instructions on accessing ePeople to elect or decline benefit enrollment and to access payroll and personal information. Return this form to your HR Business Partner.

Signature: _____          Date: ___1/5/2016_____

Print Name: _____Sharon Barrett_____



**Full-Time Employees**
COPY – for your records

# ePeople Guide

All employee information is housed in an easy-to-use self-service system called, ePeople.

**ePeople URL:** https://epeople.erpcre.com
**Username:**  firstname.lastname (your network log in)
**Password:**  your current network password

Please log in to ePeople to complete the following:

- **Elect withholdings on your federal tax form**
  *Navigation: Main Menu>Self Service>Payroll & Compensation>W-4 Tax Information*
  *(If you do not designate your federal tax elections, your withholdings will default to single and 0)*

- **Complete information for direct deposit account(s)**
  *Navigation: Main Menu>Self Service>Payroll & Compensation>Direct Deposit*
  *(Your direct deposit will not be active until account confirmation is sent  to HR-Payroll@cassidyturley.com)*

- **Review and verify personal information such as name, address, etc.** (make changes, if necessary)
  *Navigation: Main Menu>Self Service>Personal Information*

- **Add emergency contacts**
  *Navigation: Main Menu>Self Service>Personal Information>Emergency Contacts*

- **Add license/certification information (if applicable)**
  *Navigation: Main Menu>Self Service>Learning & Development>My Current Profile>License & Certifications*

- **Enter Timesheet (if applicable)**
  *Navigation: Main Menu>Self Service>Time Reporting> Report Time > Timesheet*
  *(If you receive an error please email HR-Payroll@cassidyturley.com)*

- **Select your benefit elections \*\***
  *Log into ePeople and select the Benefits Enrollment & Change option or*
  *Navigation: Main Menu>Self Service>Benefits>Benefits Enrollment> Click  Select on New Hire Event*

Beginning on your first date of full-time employment, you will access your benefit enrollment form in ePeople accessible via our company intranet, eCommunity.  eCommunity is the Legacy Cassidy Turley / DTZ intranet, containing valuable employee information and forms. Though we are operating under one brand and doing business as Cushman & Wakefield, your benefit options will be that of the Legacy Cassidy Turley / DTZ organization, until such time we have consolidated benefit platforms.

You must complete your enrollment form within your first 31 days of employment in order to participate in DTZ Benefits. Benefits are subject to change during the next open enrollment period. For benefit questions, contact your HR Business Partner or call the HR Benefit Hotline at 877.464.5633 or HR-benefits@cassidyturley.com

Retain this form for your records.

*CC. Y – for your records*

 **CUSHMAN & WAKEFIELD**

# Benefit Information

We are pleased to offer multiple benefit options to our employees.  Detailed documents on our many benefit options may be found on eCommunity in two convenient places.

## 1.) New Employee Welcome Page
Navigation: eCommunity > Company Resources > Human Resources > Welcome New Employees
URL: https://ecommunity.cassidyturley.com/human-resources/Pages/Welcome-to-Cassidy-Turley.aspx

## 2.) Human Resources Page
Navigation: eCommunity > Company Resources > Human Resources
URL: https://ecommunity.cassidyturley.com/human-resources/Pages/HR%20Home%20Page%20-%20NEW.aspx

eCommunity is the Legacy Cassidy Turley / DTZ intranet, containing valuable employee information and forms.  Though we are operating under one brand and doing business as Cushman & Wakefield, your benefit options will be that of the Legacy Cassidy Turley / DTZ organization, until such time we have consolidated benefit platforms.

eCommunity will launch as your home page when you open a new internet browser window on your work computer.  If you are outside of the network, you can access eCommunity via the direct URL below:

https://ecommunity.cassidyturley.com

*If outside the network, you will be prompted to enter your network username and password.*

**Please visit eCommunity to view the following:**

• **Benefit Summary Plan Descriptions (SPD's) or Certificate of Coverage (COC)**

• **Summary of Benefit Coverage (SBC's)**

• **401(k) Summary Plan Descriptions (Non-Commissioned Employees Only)**

• **All benefit information, forms, and contacts**

Retain this copy for your records.

Last Updated: 9.9.15


**CUSHMAN & WAKEFIELD**

# Benefit Information

We are pleased to offer multiple benefit options to our employees. Detailed documents on our many benefit options may be found on eCommunity in two convenient places.

## 1.) New Employee Welcome Page
Navigation: eCommunity > Company Resources > Human Resources > Welcome New Employees
URL: https://ecommunity.cassidyturley.com/human-resources/Pages/Welcome-to-Cassidy-Turley.aspx

## 2.) Human Resources Page
Navigation: eCommunity > Company Resources > Human Resources
URL: https://ecommunity.cassidyturley.com/human-resources/Pages/HR%20Home%20Page%20-%20NEW.aspx

eCommunity is the Legacy Cassidy Turley / DTZ intranet, containing valuable employee information and forms. Though we are operating under one brand and doing business as Cushman & Wakefield, your benefit options will be that of the Legacy Cassidy Turley / DTZ organization, until such time we have consolidated benefit platforms.

eCommunity will launch as your home page when you open a new internet browser window on your work computer. If you are outside of the network, you can access eCommunity via the direct URL below:

https://ecommunity.cassidyturley.com

*If outside the network, you will be prompted to enter your network username and password.*

**Please visit eCommunity to view the following:**

- **Benefit Summary Plan Descriptions (SPD's) or Certificate of Coverage (COC)**

- **Summary of Benefit Coverage (SBC's)**

- **401(k) Summary Plan Descriptions (Non-Commissioned Employees Only)**

- **All benefit information, forms, and contacts**

Sign below to acknowledge you have received instructions and understand how to access DTZ Benefit information. Return this form to your Human Resources Business Partner.

Signature: _____   Date: ___Y5/2016___

Print Name: ___Sharon Barnett___

Last Updated: 9.8.15



**CUSHMAN & WAKEFIELD**

**New Hire Information**

(Please Print)

**First Name:** _Sharon_   **Middle Name:** _Guarino_   **Last Name:** _Barnett_
**(as it appears on your social security card)**

**Preferred Name / Nickname:** _Sharon_

**Home/Mailing Address:** _P.O. Box 2921    546 Gold Dust Drive_
**City:** _Edwards_   **State:** _CO_   **Zip:** _81632_   **County:** _Eagle_

**Home Phone Number:** _303 210 9904_   **Cell Phone Number:** _303 210 9904_

**Email Address:** _sharongbarnett@yahoo.com_

**Date of Birth:** _5 18 57_   **Social Security Number:** _174 44 3709_   M ☐   F ☒

**Marital Status:**   Married ☐   Divorced ☒   Single ☐   Separated ☐   Widowed ☐

Ethnicity:

☐ **Hispanic or Latino**

A person of Cuban, Mexican, Puerto Rican, South or Central American, or other Spanish culture or origin regardless of race

Race:
A person may identify with more than one of the below five races

☒ **White (Not Hispanic or Latino)**
A person having origins in any of the original peoples of Europe, the Middle East, or North Africa

☐ **Black or African American (Not Hispanic or Latino)**
A person having origins in any of the black racial groups of Africa

☐ **Native Hawaiian or Other Pacific Islander (Not Hispanic or Latino)**
A person having origins in any of the peoples of Hawaii, Guam, Samoa or other Pacific Islands

☐ **Asian (Not Hispanic or Latino)**
A person having origins in any of the original peoples of the Far East, Southeast, Asia or the Indian Subcontinent, including, for example, Cambodia, China, India, Japan, Korea, Malaysia, Pakistan, the Philippine Islands, Thailand and Vietnam

☐ **American Indian or Alaskan Native (Not Hispanic or Latino)**
A person having origins in any of the original peoples of North and South American (including Central America) and who maintain tribal affiliation or community attachment

## IN CASE OF AN EMERGENCY, PLEASE CONTACT:

**Name:** _Peter Krause_   **Relationship:** _Boyfriend_

**Phone Number #1:** _970 409 0663_   (Home/Cell/Work) **City:** _Edwards_   **State:** _CO._

**Phone Number #2:** _____ (Home/Cell/Work)

**Phone Number #3:** _____ (Home/Cell/Work)



# HIPAA & Section 125 Notification

**Cushman & Wakefield NOTICE OF HIPAA SPECIAL ENROLLMENT RIGHTS**

**You and your dependents are eligible to participate in C&W's Group Health Plan (the Plan), effective the date of your hire.**

When enrollment in the Plan is offered to you and your dependents (including your spouse or domestic partner) and is declined, then under the special enrollment provisions of the Health Insurance Portability and Accountability Act (HIPAA), you and your dependents (including your spouse or domestic partner) may be eligible to enroll in the Plan during the plan year, even if you previously declined coverage.

If you are declining enrollment for yourself or your dependents (including your spouse or domestic partner) because of other health insurance or group health plan coverage, you may be able to enroll yourself and your dependents in this Plan if you or your dependents lose eligibility for that other coverage (or if the employer stops contributing toward your or your dependents' other coverage).  However, **you must request enrollment in ePeople within 31 days after your or your dependents' other coverage ends** (or after the employer stops contributing toward the other coverage).

If you are declining enrollment for yourself or your dependents (including your spouse) because you have COBRA continuation coverage under another plan, you will not be eligible for special enrollment until COBRA continuation coverage has been exhausted or terminated as a result of loss of eligibility.

In addition, if you have a new dependent as a result of marriage, birth, adoption, or placement for adoption, you may be able to enroll yourself and your dependents. However, **you must request enrollment in ePeople within 31 days after the marriage, birth, adoption, or placement for adoption.**

C&W will also allow a special enrollment opportunity if you or your eligible dependents either:

- Lose Medicaid or Children's Health Insurance Program (CHIP) coverage because you are no longer eligible; or

- Become eligible for a state's premium assistance program under Medicaid or CHIP.

For these Medicaid/CHIP enrollment opportunities, you will have 60 days – instead of 31 – from the date of the Medicaid/CHIP eligibility change to request enrollment in the Plan.  This 60-day extension does not apply to enrollment opportunities other than the Medicaid/CHIP eligibility change.

Loss of eligibility does not include a loss due to the failure of an individual or the participant to pay premiums on a timely basis or termination of coverage for cause (i.e., submission of a fraudulent claim or an intentional misrepresentation of a material fact in connection with the Plan).

**Annual Open Enrollment provides you with the opportunity to enroll yourself or your dependents if you previously declined coverage for you or your dependents.**

 **CUSHMAN & WAKEFIELD**   **HIPAA & Section 125 Notification (page 2)**

**C&W NOTICE OF SECTION 125**

If you participate in the medical, dental and vision program, you are <u>automatically</u> enrolled in the Section 125 premium only contribution Plan. This will continue from year to year until you notify Cassidy Turley in writing prior to the Plan effective date or you are no longer eligible to participate in the Plan.

Section 125 of the IRS code helps you take advantage of federal tax laws by deducting your contributions toward the medical, dental and vision plans on a pretax salary basis each pay period. This could result in savings of approximately 20% (depending on your tax bracket). This will apply to all Federal and State taxes as allowed by law.

Deductions for Federal and State taxes, Social Security and State Disability Insurance (if applicable) will be reduced. Any benefits for which I might become entitled for Social Security, State Disability and State Employment may also be minimally reduced as a result of this election.

Once you are enrolled in the Section 125 Plan, you cannot change or revoke your election at any time during the plan year unless you have a change in family status, as defined below:

If you have a change in family status, **you must submit your request in ePeople within 31 days of the event or you will be required to wait until the next open enrollment period to make any changes.**

If you decline/delete coverage now for yourself and/or your eligible dependent(s), you will <u>not</u> be able to obtain coverage until the next open enrollment period.

**A Change in Family Status includes the following events:**
- Change in Participant's Marital Status, including marriage, divorce, legal separation, or annulment;
- Death of a spouse or a child
- Birth or adoption of a child or placement of a child for adoption
- Termination or commencement of a spouse's employment
- A reduction or increase in hours of employment by the employee, spouse or dependent, including a switch between part-time and full time, a strike or lockout
- Significant change in health coverage of the employee or spouse attributable to the spouse's employment
- Commencement or return from an unpaid leave of absence by the employee or spouse
- Change in child's status to satisfy or cease to satisfy plan requirements for unmarried dependents
- Change in residence or worksite of an employee or spouse or child that changes such individual's eligibility for coverage
- A "special enrollment" event under the Health Insurance Portability and Accountability Act of 1996 (HIPAA)
- (now IRC Section 9801 et seq.)
- Mid-year entitlement to Medicare of Medicaid
- Plan's receipt of a court order, such as a qualified medical child support order (QMCSO) requiring coverage of an employee's child
- Any other such event the Plan Administrator determines is consistent with the intent of, and not specifically prohibited by, applicable law or regulations. Any such determination by the Plan Administrator shall be made on a nondiscriminatory basis

Sign below to acknowledge you have read and received a copy of the C&W Notice of HIPAA Special Enrollment Rights and Notice of Section 125.

Signature: _____   Date: 1/5/2016 _____

Print Name: _____ Sharon Barrett _____

# Application for Employment



CUSHMAN & WAKEFIELD

**Complete and accurate responses are required for consideration. Your failure to completely respond to each inquiry may disqualify you for consideration from employment. If an area does not apply, write "N/A." Resumes are not a substitute for a completed application.**

Cushman & Wakefield is an equal opportunity employer. We are committed to our policy of providing equal employment opportunity to employees and job applicants in a manner consistent with applicable laws and regulations, including those prohibiting employment discrimination on the basis of race, color, religion, sex, pregnancy, national origin, ancestry, citizenship, age, physical or mental disability, familial status, creed, sexual orientation, gender identity, marital status, status with regard to public assistance, membership or activity in a local human rights commission, or any other class protected by law.

| Full Legal Name: | Sharon Guarino Barrett | Position Applying For: Sr. Vice President | |
|---|---|---|---|
| Current Street Address: | 546 Gold Dust Dr. P.O. Box 2921 | Home Telephone Number: 303 210 9904 | |
| City/State/Zip: | Edwards, CO. 81632 | Cell or Other Number: 303 210 9904 | |
| Email address: | sharongbarrett@yahoo.com | | |
| Desired Salary/Hourly Rate: | $ 200,000 annual salary | If under age 18, can you produce the necessary work certificate at the time of employment? n/A | Yes ☐ No ☐ |
| Type of Employment Desired: | Full-time ☒  Part-time ☐ | If part-time, specify hours: | |
| Are you willing to work overtime? | Yes ☒  No ☐ | If hired, what date can you start? Jan. 11, 2016 | |
| Have you previously applied for employment with our company? | Yes ☐  No ☒ | If yes, when did you apply and what position did you apply for? | |
| Have you ever been employed by Cushman & Wakefield or any of its legacy companies ? | Yes ☒  No ☐ | If yes, provide dates of employment, location, and reason for separation from employment: | March 2008 – April 2010 |
| Referral Source: | Mike Smith  President-West | If current employee, please let us know the employee's name: | |

## Education

| Education | School Name & Location (City/State) | Did you graduate? | # of Years Completed | Course of Study/Major | Diploma/Degree/ Certificate Earned? |
|---|---|---|---|---|---|
| High School | Shanksville Stonycreek, PA | Yes ☒ No ☐ | 4 | General | Yes ☒ No ☐ |
| College | n/A | Yes ☐ No ☐ | | | Yes ☐ No ☐ |
| Tech/Trade or Post College | UCR – CoreNetGlobal | Yes ☒ No ☐ | 2 | | Yes ☒ No ☐ |

## Work Experience

Please list the names of your present and/or previous employers in chronological order in the section below. Account for all periods of time including any period of unemployment. If self-employed, please supply firm name. You may include any verifiable work performed on a volunteer basis, internships, or military service.

| Employer Name: CBRE | | Dates Employed: | From: June 2011 | To: Sept. 2015 |
|---|---|---|---|---|
| Job Title: Sr. Vice President | | Wages: | Start: | Final: |
| Responsibilities: Bus. Development / Account pursuits | | What will this employer say is the reason your employment ended? | Other opportunities | |

| Employer Name: Cushman & Wakefield | | Dates Employed: | From: March 2008 | To: April 2010 |
|---|---|---|---|---|
| Job Title: Sr. Vice President | | Wages: | Start: | Final: |
| Responsibilities: Bus. Development/Account pursuits | | What will this employer say is the reason your employment ended? | Other employment | |

| Employer Name: Liberty Greenfield | | Dates Employed: | From: Jan. '99 | To: Dec. 2007 |
|---|---|---|---|---|
| Job Title: Partner | | Wages: | Start: | Final: |
| Responsibilities: Bus. Development / Account Pursuits | | What will this employer say is the reason your employment ended? | Other employment | |

| Have you ever been discharged or asked to resign from a job? | Yes ☐ No ☒ | If yes, how many times and why? | |
| Has your employment ever been terminated by mutual agreement? | Yes ☒ No ☐ | If yes, how many times and why? | once / by mutual agreement |
| Have you ever been given the choice to resign in lieu of discharge? | Yes ☐ No ☒ | If yes, how many times and why? | |
| Are you authorized to work in the U.S.? | Yes ☒ No ☐ | | |

Explain any gaps in your work history listed above: Sept. 11, 2015 – January 11, 2016 / Real Estate consultant

Are you able to perform the essential functions of this job? Yes ☒  No ☐

# Application for Employment



CUSHMAN & WAKEFIELD

*Cushman & Wakefield complies with all applicable federal, state, and local laws, regulations, and ordinances.*

**Applicants in Indiana:** Indiana law prohibits smoking in places of employment, public places, and areas within eight (8) feet of an entrance to such places, with certain exceptions.

**Applicants in Tennessee:** Tennessee law prohibits smoking in all enclosed public places within the State of Tennessee, with certain exceptions.

**Applicants in Massachusetts:** "It is unlawful in Massachusetts to require or administer a lie detector test as a condition of employment or continued employment. An employer who violates this law shall be subject to criminal penalties and civil liability."

**Applicants in Maryland:** **"UNDER MARYLAND LAW, AN EMPLOYER MAY NOT REQUIRE OR DEMAND, AS A CONDITION OF EMPLOYMENT, PROSPECTIVE EMPLOYMENT, OR CONTINUED EMPLOYMENT, THAT AN INDIVIDUAL SUBMIT TO OR TAKE A LIE DETECTOR OR SIMILAR TEST. AN EMPLOYER WHO VIOLATES THIS LAW IS GUILTY OF A MISDEMEANOR AND SUBJECT TO A FINE NOT EXCEEDING $100."**

My signature below is my acknowledgement of the above notice regarding Maryland law:

| Maryland Applicant Signature: | | Date: | |
|---|---|---|---|

**Applicant's Certification and Agreement (Please read this section carefully before signing this application):**

I understand and agree that this application is considered active for the position(s) for which I have applied.

I understand and agree that, if hired, my employment with Cushman & Wakefield is employment at will, which means there is no guarantee of any specific length of employment and either Cushman & Wakefield or I may terminate the employment relationship at any time, for any reason, with or without cause or progressive discipline, subject to applicable federal, state, or local laws or regulations.

I understand and agree that, consistent with applicable law, Cushman & Wakefield conducts pre-employment drug screenings and background checks as a part of the hiring process and an offer of employment is conditioned on an appropriate test result, that my refusal to submit to a pre-employment drug screen and background checks will preclude employment with Cushman & Wakefield, and that if I am offered employment and do not receive an appropriate pre-employment drug test result and background check results, the employment offer may be withdrawn. If employed by Cushman & Wakefield, I understand and agree that I may be subject to additional background checks and drug and alcohol testing, consistent with applicable law.

I understand and agree that if the operation of a motor vehicle is an essential duty of the job for which I am applying, my employment and/or continued employment is contingent upon possession of a valid driver's/operator's license, proof of and maintenance of insurance consistent with applicable law, and an acceptable driving record to and for DTZ's insurer.

If hired, I understand and agree that it is my responsibility to comply with DTZ's policies and procedures and that Cushman & Wakefield has the right to modify its policies and procedures, at its sole discretion and that, as a condition of employment and to the extent permitted by applicable law, I may be required to sign confidentiality, restrictive covenant, and/or conflict of interest documents, as well as an agreement to arbitrate.

If hired, I understand and agree that I will be required to complete the Form I-9 Employment Eligibility Verification when employment begins and present original documentation establishing my identity and employment eligibility, as Cushman & Wakefield only employs individuals who are authorized to work in the United States. I also understand Cushman & Wakefield participates in E-Verify, which is an Internet-based system operated by the U.S. Citizenship and Immigration Services (USCIS), part of the Department of Homeland Security (DHS), in partnership with the Social Security Administration (SSA) that allows participating employers to electronically verify the employment eligibility of their newly hired employees and/or employees assigned to a covered federal contract.

I understand and agree that Cushman & Wakefield and/or its agents may confirm all statements contained in this application and/or any resume furnished by me, as it relates to the position I am seeking and to the extent permitted by applicable law, and I hereby agree to complete any requisite authorization forms for any background investigation. I authorize and consent to, without reservation, any party or agency contacted by Cushman & Wakefield to furnish the above-mentioned information. I hereby release from liability Cushman & Wakefield and its representative for seeking such information and all other persons, corporations, or organizations furnishing such information.

**I certify that the information I have provided on this application is true, accurate, and complete.** I understand and agree that falsification, misrepresentation, or omission of information may result in disqualification from consideration for employment, or if I become employed, disciplinary action, up to and including termination.

| Applicant Signature: | *[signature]* | Date Signed: | 1/5/2016 |
|---|---|---|---|

**Minor Applicants:** The foregoing release and consent must be signed by your parent or legal guardian. Signature by your parent or legal guardian constitutes acknowledgement by you and your parent or legal guardian that Cushman & Wakefield can, to the extent permitted by applicable law, test you for illegal or controlled substances, conduct inspections of property without notice, and communicate test results to Cushman & Wakefield personnel (who need to know), to you, and to your parent or legal guardian.

| Parent/Legal Guardian Signature: | | Date Signed: | |
|---|---|---|---|
| Witness Signature: | | Date Signed: | |



**Instructions for Employment Eligibility Verification**

**Department of Homeland Security**
U.S. Citizenship and Immigration Services

**USCIS
Form I-9**

OMB No. 1615-0047
Expires 03/31/2016

---

**Read all instructions carefully before completing this form.**

---

**Anti-Discrimination Notice.** It is illegal to discriminate against any work-authorized individual in hiring, discharge, recruitment or referral for a fee, or in the employment eligibility verification (Form I-9 and E-Verify) process based on that individual's citizenship status, immigration status or national origin. Employers **CANNOT** specify which document(s) they will accept from an employee. The refusal to hire an individual because the documentation presented has a future expiration date may also constitute illegal discrimination. For more information, call the Office of Special Counsel for Immigration-Related Unfair Employment Practices (OSC) at 1-800-255-7688 (employees), 1-800-255-8155 (employers), or 1-800-237-2515 (TDD), or visit **www.justice.gov/crt/about/osc**.

## What Is the Purpose of This Form?

Employers must complete Form I-9 to document verification of the identity and employment authorization of each new employee (both citizen and noncitizen) hired after November 6, 1986, to work in the United States. In the Commonwealth of the Northern Mariana Islands (CNMI), employers must complete Form I-9 to document verification of the identity and employment authorization of each new employee (both citizen and noncitizen) hired after November 27, 2011. Employers should have used Form I-9 CNMI between November 28, 2009 and November 27, 2011.

## General Instructions

Employers are responsible for completing and retaining Form I-9. For the purpose of completing this form, the term "employer" means all employers, including those recruiters and referrers for a fee who are agricultural associations, agricultural employers, or farm labor contractors.

Form I-9 is made up of three sections. Employers may be fined if the form is not complete. Employers are responsible for retaining completed forms. Do not mail completed forms to U.S. Citizenship and Immigration Services (USCIS) or Immigration and Customs Enforcement (ICE).

## Section 1. Employee Information and Attestation

Newly hired employees must complete and sign Section 1 of Form I-9 **no later than the first day of employment**. Section 1 should never be completed before the employee has accepted a job offer.

Provide the following information to complete Section 1:

**Name:** Provide your full legal last name, first name, and middle initial. Your last name is your family name or surname. If you have two last names or a hyphenated last name, include both names in the last name field. Your first name is your given name. Your middle initial is the first letter of your second given name, or the first letter of your middle name, if any.

**Other names used:** Provide all other names used, if any (including maiden name). If you have had no other legal names, write "N/A."

**Address:** Provide the address where you currently live, including Street Number and Name, Apartment Number (if applicable), City, State, and Zip Code. Do not provide a post office box address (P.O. Box). Only border commuters from Canada or Mexico may use an international address in this field.

**Date of Birth:** Provide your date of birth in the mm/dd/yyyy format. For example, January 23, 1950, should be written as 01/23/1950.

**U.S. Social Security Number:** Provide your 9-digit Social Security number. Providing your Social Security number is voluntary. However, if your employer participates in E-Verify, you must provide your Social Security number.

**E-mail Address and Telephone Number (Optional):** You may provide your e-mail address and telephone number. Department of Homeland Security (DHS) may contact you if DHS learns of a potential mismatch between the information provided and the information in DHS or Social Security Administration (SSA) records. You may write "N/A" if you choose not to provide this information.

---

**EMPLOYERS MUST RETAIN COMPLETED FORM I-9
DO NOT MAIL COMPLETED FORM I-9 TO ICE OR USCIS**

All employees must attest in Section 1, under penalty of perjury, to their citizenship or immigration status by checking one of the following four boxes provided on the form:

1. **A citizen of the United States**

2. **A noncitizen national of the United States:** Noncitizen nationals of the United States are persons born in American Samoa, certain former citizens of the former Trust Territory of the Pacific Islands, and certain children of noncitizen nationals born abroad.

3. **A lawful permanent resident:** A lawful permanent resident is any person who is not a U.S. citizen and who resides in the United States under legally recognized and lawfully recorded permanent residence as an immigrant. The term "lawful permanent resident" includes conditional residents. If you check this box, write either your Alien Registration Number (A-Number) or USCIS Number in the field next to your selection. At this time, the USCIS Number is the same as the A-Number without the "A" prefix.

4. **An alien authorized to work:** If you are not a citizen or national of the United States or a lawful permanent resident, but are authorized to work in the United States, check this box.

   If you check this box:

   a. Record the date that your employment authorization expires, if any. Aliens whose employment authorization does not expire, such as refugees, asylees, and certain citizens of the Federated States of Micronesia, the Republic of the Marshall Islands, or Palau, may write "N/A" on this line.

   b. Next, enter your Alien Registration Number (A-Number)/USCIS Number. At this time, the USCIS Number is the same as your A-Number without the "A" prefix. If you have not received an A-Number/USCIS Number, record your Admission Number. You can find your Admission Number on Form I-94, "Arrival-Departure Record," or as directed by USCIS or U.S. Customs and Border Protection (CPB).

      (1) If you obtained your admission number from CBP in connection with your arrival in the United States, then also record information about the foreign passport you used to enter the United States (number and country of issuance).

      (2) If you obtained your admission number from USCIS *within the United States*, or you entered the United States without a foreign passport, you must write "N/A" in the Foreign Passport Number and Country of Issuance fields.

Sign your name in the "Signature of Employee" block and record the date you completed and signed Section 1. By signing and dating this form, you attest that the citizenship or immigration status you selected is correct and that you are aware that you may be imprisoned and/or fined for making false statements or using false documentation when completing this form. To fully complete this form, you must present to your employer documentation that establishes your identity and employment authorization. Choose which documents to present from the Lists of Acceptable Documents, found on the last page of this form. You must present this documentation no later than the third day after beginning employment, although you may present the required documentation before this date.

**Preparer and/or Translator Certification**

The Preparer and/or Translator Certification must be completed if the employee requires assistance to complete Section 1 (e.g., the employee needs the instructions or responses translated, someone other than the employee fills out the information blocks, or someone with disabilities needs additional assistance). The employee must still sign Section 1.

**Minors and Certain Employees with Disabilities (Special Placement)**

Parents or legal guardians assisting minors (individuals under 18) and certain employees with disabilities should review the guidelines in the *Handbook for Employers: Instructions for Completing Form I-9 (M-274)* on **www.uscis.gov/ I-9Central** before completing Section 1. These individuals have special procedures for establishing identity if they cannot present an identity document for Form I-9. The special procedures include **(1)** the parent or legal guardian filling out Section 1 and writing "minor under age 18" or "special placement," whichever applies, in the employee signature block; and **(2)** the employer writing "minor under age 18" or "special placement" under List B in Section 2.

## Section 2. Employer or Authorized Representative Review and Verification

Before completing Section 2, employers must ensure that Section 1 is completed properly and on time. Employers may not ask an individual to complete Section 1 before he or she has accepted a job offer.

Employers or their authorized representative must complete Section 2 by examining evidence of identity and employment authorization within 3 business days of the employee's first day of employment. For example, if an employee begins employment on Monday, the employer must complete Section 2 by Thursday of that week. However, if an employer hires an individual for less than 3 business days, Section 2 must be completed no later than the first day of employment. An employer may complete Form I-9 before the first day of employment if the employer has offered the individual a job and the individual has accepted.

Employers cannot specify which document(s) employees may present from the Lists of Acceptable Documents, found on the last page of Form I-9, to establish identity and employment authorization. Employees must present one selection from List A **OR** a combination of one selection from List B and one selection from List C. List A contains documents that show both identity and employment authorization. Some List A documents are combination documents. The employee must present combination documents together to be considered a List A document. For example, a foreign passport and a Form I-94 containing an endorsement of the alien's nonimmigrant status must be presented together to be considered a List A document. List B contains documents that show identity only, and List C contains documents that show employment authorization only. If an employee presents a List A document, he or she should **not** present a List B and List C document, and vice versa. If an employer participates in E-Verify, the List B document must include a photograph.

In the field below the Section 2 introduction, employers must enter the last name, first name and middle initial, if any, that the employee entered in Section 1. This will help to identify the pages of the form should they get separated.

Employers or their authorized representative must:

1. Physically examine each original document the employee presents to determine if it reasonably appears to be genuine and to relate to the person presenting it. The person who examines the documents must be the same person who signs Section 2. The examiner of the documents and the employee must both be physically present during the examination of the employee's documents.

2. Record the document title shown on the Lists of Acceptable Documents, issuing authority, document number and expiration date (if any) from the original document(s) the employee presents. You may write "N/A" in any unused fields.

   If the employee is a student or exchange visitor who presented a foreign passport with a Form I-94, the employer should also enter in Section 2:

   a. The student's Form I-20 or DS-2019 number (Student and Exchange Visitor Information System-SEVIS Number); **and** the program end date from Form I-20 or DS-2019.

3. Under Certification, enter the employee's first day of employment. Temporary staffing agencies may enter the first day the employee was placed in a job pool. Recruiters and recruiters for a fee do not enter the employee's first day of employment.

4. Provide the name and title of the person completing Section 2 in the Signature of Employer or Authorized Representative field.

5. Sign and date the attestation on the date Section 2 is completed.

6. Record the employer's business name and address.

7. Return the employee's documentation.

Employers may, but are not required to, photocopy the document(s) presented. If photocopies are made, they should be made for **ALL** new hires or reverifications. Photocopies must be retained and presented with Form I-9 in case of an inspection by DHS or other federal government agency. Employers must always complete Section 2 even if they photocopy an employee's document(s). Making photocopies of an employee's document(s) cannot take the place of completing Form I-9. Employers are still responsible for completing and retaining Form I-9.

**Unexpired Documents**

Generally, only unexpired, original documentation is acceptable. The only exception is that an employee may present a certified copy of a birth certificate. Additionally, in some instances, a document that appears to be expired may be acceptable if the expiration date shown on the face of the document has been extended, such as for individuals with temporary protected status. Refer to the *Handbook for Employers: Instructions for Completing Form I-9 (M-274)* or I-9 Central (www.uscis.gov/I-9Central) for examples.

**Receipts**

If an employee is unable to present a required document (or documents), the employee can present an acceptable receipt in lieu of a document from the Lists of Acceptable Documents on the last page of this form. Receipts showing that a person has applied for an initial grant of employment authorization, or for renewal of employment authorization, are not acceptable. Employers cannot accept receipts if employment will last less than 3 days. Receipts are acceptable when completing Form I-9 for a new hire or when reverification is required.

Employees must present receipts within 3 business days of their first day of employment, or in the case of reverification, by the date that reverification is required, and must present valid replacement documents within the time frames described below.

There are three types of acceptable receipts:

1. A receipt showing that the employee has applied to replace a document that was lost, stolen or damaged. The employee must present the actual document within 90 days from the date of hire.

2. The arrival portion of Form I-94/I-94A with a temporary I-551 stamp and a photograph of the individual. The employee must present the actual Permanent Resident Card (Form I-551) by the expiration date of the temporary I-551 stamp, or, if there is no expiration date, within 1 year from the date of issue.

3. The departure portion of Form I-94/I-94A with a refugee admission stamp. The employee must present an unexpired Employment Authorization Document (Form I-766) or a combination of a List B document and an unrestricted Social Security card within 90 days.

When the employee provides an acceptable receipt, the employer should:

1. Record the document title in Section 2 under the sections titled List A, List B, or List C, as applicable.

2. Write the word "receipt" and its document number in the "Document Number" field. Record the last day that the receipt is valid in the "Expiration Date" field.

By the end of the receipt validity period, the employer should:

1. Cross out the word "receipt" and any accompanying document number and expiration date.

2. Record the number and other required document information from the actual document presented.

3. Initial and date the change.

See the *Handbook for Employers: Instructions for Completing Form I-9 (M-274)* at **www.uscis.gov/I-9Central** for more information on receipts.

## Section 3.  Reverification and Rehires

Employers or their authorized representatives should complete Section 3 when reverifying that an employee is authorized to work. When rehiring an employee within 3 years of the date Form I-9 was originally completed, employers have the option to complete a new Form I-9 or complete Section 3. When completing Section 3 in either a reverification or rehire situation, if the employee's name has changed, record the name change in Block A.

For employees who provide an employment authorization expiration date in Section 1, employers must reverify employment authorization on or before the date provided.

Some employees may write "N/A" in the space provided for the expiration date in Section 1 if they are aliens whose employment authorization does not expire (e.g., asylees, refugees, certain citizens of the Federated States of Micronesia, the Republic of the Marshall Islands, or Palau). Reverification does not apply for such employees unless they chose to present evidence of employment authorization in Section 2 that contains an expiration date and requires reverification, such as Form I-766, Employment Authorization Document.

Reverification applies if evidence of employment authorization (List A or List C document) presented in Section 2 expires. However, employers should not reverify:

1. U.S. citizens and noncitizen nationals; or

2. Lawful permanent residents who presented a Permanent Resident Card (Form I-551) for Section 2.

Reverification does not apply to List B documents.

If both Section 1 and Section 2 indicate expiration dates triggering the reverification requirement, the employer should reverify by the earlier date.

For reverification, an employee must present unexpired documentation from either List A or List C showing he or she is still authorized to work. Employers CANNOT require the employee to present a particular document from List A or List C. The employee may choose which document to present.

To complete Section 3, employers should follow these instructions:

1. Complete Block A if an employee's name has changed at the time you complete Section 3.

2. Complete Block B with the date of rehire if you rehire an employee within 3 years of the date this form was originally completed, and the employee is still authorized to be employed on the same basis as previously indicated on this form. Also complete the "Signature of Employer or Authorized Representative" block.

3. Complete Block C if:

    a. The employment authorization or employment authorization document of a current employee is about to expire and requires reverification; or

    b. You rehire an employee within 3 years of the date this form was originally completed and his or her employment authorization or employment authorization document has expired. (Complete Block B for this employee as well.)

    To complete Block C:

    a. Examine either a List A or List C document the employee presents that shows that the employee is currently authorized to work in the United States; and

    b. Record the document title, document number, and expiration date (if any).

4. After completing block A, B or C, complete the "Signature of Employer or Authorized Representative" block, including the date.

    For reverification purposes, employers may either complete Section 3 of a new Form I-9 or Section 3 of the previously completed Form I-9. Any new pages of Form I-9 completed during reverification must be attached to the employee's original Form I-9. If you choose to complete Section 3 of a new Form I-9, you may attach just the page containing Section 3, with the employee's name entered at the top of the page, to the employee's original Form I-9. If there is a more current version of Form I-9 at the time of reverification, you must complete Section 3 of that version of the form.

## What Is the Filing Fee?

There is no fee for completing Form I-9. This form is not filed with USCIS or any government agency. Form I-9 must be retained by the employer and made available for inspection by U.S. Government officials as specified in the **"USCIS Privacy Act Statement"** below.

## USCIS Forms and Information

For more detailed information about completing Form I-9, employers and employees should refer to the *Handbook for Employers: Instructions for Completing Form I-9 (M-274)*.

You can also obtain information about Form I-9 from the USCIS Web site at www.uscis.gov/I-9Central, by e-mailing USCIS at **I-9Central@dhs.gov**, or by calling **1-888-464-4218**. For TDD (hearing impaired), call **1-877-875-6028**.

To obtain USCIS forms or the *Handbook for Employers*, you can download them from the USCIS Web site at www.uscis.gov/forms. You may order USCIS forms by calling our toll-free number at **1-800-870-3676**. You may also obtain forms and information by contacting the USCIS National Customer Service Center at **1-800-375-5283**. For TDD (hearing impaired), call **1-800-767-1833**.

Information about E-Verify, a free and voluntary program that allows participating employers to electronically verify the employment eligibility of their newly hired employees, can be obtained from the USCIS Web site at www.dhs.gov/E-Verify, by e-mailing USCIS at **E-Verify@dhs.gov** or by calling **1-888-464-4218**. For TDD (hearing impaired), call **1-877-875-6028.**

Employees with questions about Form I-9 and/or E-Verify can reach the USCIS employee hotline by calling **1-888-897-7781**. For TDD (hearing impaired), call **1-877-875-6028.**

## Photocopying and Retaining Form I-9

A blank Form I-9 may be reproduced, provided all sides are copied. The instructions and Lists of Acceptable Documents must be available to all employees completing this form. Employers must retain each employee's completed Form I-9 for as long as the individual works for the employer. Employers are required to retain the pages of the form on which the employee and employer enter data. If copies of documentation presented by the employee are made, those copies must also be kept with the form. Once the individual's employment ends, the employer must retain this form for either 3 years after the date of hire or 1 year after the date employment ended, whichever is later.

Form I-9 may be signed and retained electronically, in compliance with Department of Homeland Security regulations at 8 CFR 274a.2.

## USCIS Privacy Act Statement

**AUTHORITIES:** The authority for collecting this information is the Immigration Reform and Control Act of 1986, Public Law 99-603 (8 USC 1324a).

**PURPOSE:** This information is collected by employers to comply with the requirements of the Immigration Reform and Control Act of 1986. This law requires that employers verify the identity and employment authorization of individuals they hire for employment to preclude the unlawful hiring, or recruiting or referring for a fee, of aliens who are not authorized to work in the United States.

**DISCLOSURE:** Submission of the information required in this form is voluntary. However, failure of the employer to ensure proper completion of this form for each employee may result in the imposition of civil or criminal penalties. In addition, employing individuals knowing that they are unauthorized to work in the United States may subject the employer to civil and/or criminal penalties.

**ROUTINE USES:** This information will be used by employers as a record of their basis for determining eligibility of an employee to work in the United States. The employer will keep this form and make it available for inspection by authorized officials of the Department of Homeland Security, Department of Labor, and Office of Special Counsel for Immigration-Related Unfair Employment Practices.

## Paperwork Reduction Act

An agency may not conduct or sponsor an information collection and a person is not required to respond to a collection of information unless it displays a currently valid OMB control number. The public reporting burden for this collection of information is estimated at 35 minutes per response, including the time for reviewing instructions and completing and retaining the form. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to: U.S. Citizenship and Immigration Services, Regulatory Coordination Division, Office of Policy and Strategy, 20 Massachusetts Avenue NW, Washington, DC 20529-2140; OMB No. 1615-0047. **Do not mail your completed Form I-9 to this address.**

**CUSHMAN & WAKEFIELD**

| 2016 Payroll Calendar | | |
|---|---|---|
| **Pay Period** | | **Pay Date** |
| 12/21/15 - 01/03/16 | | 01/07/16 |
| 01/04/16 - 01/17/16 | | 01/21/16 |
| 01/18/16 - 01/31/16 | | 02/04/16 |
| 02/01/16 - 02/14/16 | | 02/18/16 |
| 02/15/16 - 02/28/16 | | 03/03/16 |
| 02/29/16 - 03/13/16 | | 03/17/16 |
| 03/14/16 - 03/27/16 | | 03/31/16 |
| 03/28/16 - 04/10/16 | | 04/14/16 |
| 04/11/16 - 04/24/16 | | 04/28/16 |
| 04/25/16- 05/08/16 | | 05/12/16 |
| 05/09/15 - 05/22/16 | | 05/26/16 |
| 05/23/16 - 06/05/16 | | 06/09/16 |
| 06/06/16- 06/19/16 | | 06/23/16 |
| 06/20/16 - 07/03/16 | | 07/07/16 |
| 07/04/16- 07/17/16 | | 07/21/16 |
| 07/18/16- 07/31/16 | | 08/04/16 |
| 08/01/16- 08/14/16 | | 08/18/16 |
| 08/15/16 - 08/28/16 | | 09/01/16 |
| 08/29/16- 09/11/16 | | 09/15/16 |
| 09/12/16 - 09/25/16 | | 09/29/16 |
| 09/26/16- 10/09/16 | | 10/13/16 |
| 10/10/16- 10/23/16 | | 10/27/16 |
| 10/24/16- 11/06/16 | | 11/10/16 |
| 11/07/16- 11/20/16 | | 11/23/16 |
| 11/21/16 - 12/04/16 | | 12/08/16 |
| 12/05/16 - 12/18/16 | | 12/22/16 |



ull-Time Employees

# HIPAA & Section 125 Notification

**DTZ NOTICE OF HIPAA SPECIAL ENROLLMENT RIGHTS**

**You and your dependents are eligible to participate in DTZ's Group Health Plan (the Plan), effective the date of your hire.**

When enrollment in the Plan is offered to you and your dependents (including your spouse or domestic partner) and is declined, then under the special enrollment provisions of the Health Insurance Portability and Accountability Act (HIPAA), you and your dependents (including your spouse or domestic partner) may be eligible to enroll in the Plan during the plan year, even if you previously declined coverage.

If you are declining enrollment for yourself or your dependents (including your spouse or domestic partner) because of other health insurance or group health plan coverage, you may be able to enroll yourself and your dependents in this Plan if you or your dependents lose eligibility for that other coverage (or if the employer stops contributing toward your or your dependents' other coverage).  However, **you must request enrollment in ePeople within 31 days after your or your dependents' other coverage ends** (or after the employer stops contributing toward the other coverage).

If you are declining enrollment for yourself or your dependents (including your spouse) because you have COBRA continuation coverage under another plan, you will not be eligible for special enrollment until COBRA continuation coverage has been exhausted or terminated as a result of loss of eligibility.

In addition, if you have a new dependent as a result of marriage, birth, adoption, or placement for adoption, you may be able to enroll yourself and your dependents. However, **you must request enrollment in ePeople within 31 days after the marriage, birth, adoption, or placement for adoption.**

DTZ will also allow a special enrollment opportunity if you or your eligible dependents either:

- Lose Medicaid or Children's Health Insurance Program (CHIP) coverage because you are no longer eligible; or

- Become eligible for a state's premium assistance program under Medicaid or CHIP.

For these Medicaid/CHIP enrollment opportunities, you will have 60 days – instead of 31 – from the date of the Medicaid/CHIP eligibility change to request enrollment in the Plan.  This 60-day extension does not apply to enrollment opportunities other than the Medicaid/CHIP eligibility change.

Loss of eligibility does not include a loss due to the failure of an individual or the participant to pay premiums on a timely basis or termination of coverage for cause (i.e., submission of a fraudulent claim or an intentional misrepresentation of a material fact in connection with the Plan).

**Annual Open Enrollment provides you with the opportunity to enroll yourself or your dependents if you previously declined coverage for you or your dependents.**



**HIPPA & Section 125 Notification (page 2)**

**DTZ NOTICE OF SECTION 125**

If you participate in the medical, dental and vision program, you are <u>automatically</u> enrolled in the Section 125 premium only contribution Plan. This will continue from year to year until you notify Cassidy Turley in writing prior to the Plan effective date or you are no longer eligible to participate in the Plan.

Section 125 of the IRS code helps you take advantage of federal tax laws by deducting your contributions toward the medical, dental and vision plans on a pretax salary basis each pay period. This could result in savings of approximately 20% (depending on your tax bracket). This will apply to all Federal and State taxes as allowed by law.

Deductions for Federal and State taxes, Social Security and State Disability Insurance (if applicable) will be reduced. Any benefits for which I might become entitled for Social Security, State Disability and State Employment may also be minimally reduced as a result of this election.

Once you are enrolled in the Section 125 Plan, you cannot change or revoke your election at any time during the plan year unless you have a change in family status, as defined below:

If you have a change in family status, **you must submit your request in ePeople within 31 days of the event or you will be required to wait until the next open enrollment period to make any changes.**

<span style="color:#29abe2">**If you decline/delete coverage now for yourself and/or your eligible dependent(s), you will <u>not</u> be able to obtain coverage until the next open enrollment period.**</span>

**A Change in Family Status includes the following events:**
- Change in Participant's Marital Status, including marriage, divorce, legal separation, or annulment;
- Death of a spouse or a child
- Birth or adoption of a child or placement of a child for adoption
- Termination or commencement of a spouse's employment
- A reduction or increase in hours of employment by the employee, spouse or dependent, including a switch between part-time and full time, a strike or lockout
- Significant change in health coverage of the employee or spouse attributable to the spouse's employment
- Commencement or return from an unpaid leave of absence by the employee or spouse
- Change in child's status to satisfy or cease to satisfy plan requirements for unmarried dependents
- Change in residence or worksite of an employee or spouse or child that changes such individual's eligibility for coverage
- A "special enrollment" event under the Health Insurance Portability and Accountability Act of 1996 (HIPAA)
- (now IRC Section 9801 et seq.)
- Mid-year entitlement to Medicare or Medicaid
- Plan's receipt of a court order, such as a qualified medical child support order (QMCSO) requiring coverage of an employee's child
- Any other such event the Plan Administrator determines is consistent with the intent of, and not specifically prohibited by, applicable law or regulations. Any such determination by the Plan Administrator shall be made on a nondiscriminatory basis

Sign below to acknowledge you have read and received a copy of the DTZ Notice of HIPAA Special Enrollment Rights and Notice of Section 125.

Signature: _____   Date: _____

Print Name: _____



# Benefit Information

We are pleased to offer multiple benefit options to our employees.  Detailed documents on our many benefit options may be found on eCommunity in two convenient places.

## 1.) New Employee Welcome Page
Navigation: eCommunity > Company Resources > Human Resources > Welcome New Employees
URL: https://ecommunity.cassidyturley.com/human-resources/Pages/Welcome-to-Cassidy-Turley.aspx

## 2.) Human Resources Page
Navigation: eCommunity > Company Resources > Human Resources
URL: https://ecommunity.cassidyturley.com/human-resources/Pages/HR%20Home%20Page%20-%20NEW.aspx

eCommunity is the Legacy Cassidy Turley / DTZ intranet, containing valuable employee information and forms.  Though we are operating under one brand and doing business as Cushman & Wakefield, your benefit options will be that of the Legacy Cassidy Turley / DTZ organization, until such time we have consolidated benefit platforms.

eCommunity will launch as your home page when you open a new internet browser window on your work computer.  If you are outside of the network, you can access eCommunity via the direct URL below:

https://ecommunity.cassidyturley.com

*If outside the network, you will be prompted to enter your network username and password.*

**Please visit eCommunity to view the following:**

- **Benefit Summary Plan Descriptions (SPD's) or Certificate of Coverage (COC)**

- **Summary of Benefit Coverage (SBC's)**

- **401(k) Summary Plan Descriptions (Non-Commissioned Employees Only)**

- **All benefit information, forms, and contacts**

Sign below to acknowledge you have received instructions and understand how to access DTZ Benefit information. Return this form to your Human Resources Business Partner.

Signature: _____   Date: _____

Print Name: _____



Full-Time Employees

# ePeople Guide

All employee information is housed in an easy-to-use self-service system called, ePeople.

**ePeople URL:** https://epeople.erpcre.com
**Username:** firstname.lastname (your network log in)
**Password:** your current network password

Please log in to ePeople to complete the following:

- **Elect withholdings on your federal tax form**
  *Navigation: Main Menu>Self Service>Payroll & Compensation>W-4 Tax Information*
  *(If you do not designate your federal tax elections, your withholdings will default to single and 0)*

- **Complete information for direct deposit account(s)**
  *Navigation: Main Menu>Self Service>Payroll & Compensation>Direct Deposit*
  *(Your direct deposit will not be active until account confirmation is sent to HR-Payroll@cassidyturley.com)*

- **Review and verify personal information such as name, address, etc.** (make changes, if necessary)
  *Navigation: Main Menu>Self Service>Personal Information*

- **Add emergency contacts**
  *Navigation: Main Menu>Self Service>Personal Information>Emergency Contacts*

- **Add license/certification information (if applicable)**
  *Navigation: Main Menu>Self Service>Learning & Development>My Current Profile>License & Certifications*

- **Enter Timesheet (if applicable)**
  *Navigation: Main Menu>Self Service>Time Reporting> Report Time > Timesheet*
  (If you receive an error please email HR-Payroll@cassidyturley.com)

- **Select your benefit elections \*\***
  *L*og into ePeople and select the *Benefits Enrollment & Change* option or
  *Navigation: Main Menu>Self Service>Benefits>Benefits Enrollment> Click  Select on New Hire Event*

Beginning on your first date of full-time employment, you will access your benefit enrollment form in ePeople accessible via our company intranet, eCommunity.  eCommunity is the Legacy Cassidy Turley / DTZ intranet, containing valuable employee information and forms.  Though we are operating under one brand and doing business as Cushman & Wakefield, your benefit options will be that of the Legacy Cassidy Turley / DTZ organization, until such time we have consolidated benefit platforms.

You must complete your enrollment form within your first 31 days of employment in order to participate in DTZ Benefits. Benefits are subject to change during the next open enrollment period. For benefit questions, contact your HR Business Partner or call the HR Benefit Hotline at 877.464.5633 or **HR-benefits@cassidyturley.com**

Sign below to acknowledge you have received instructions on accessing ePeople to elect or decline benefit enrollment and to access payroll and personal information. Return this form to your HR Business Partner.

Signature: _____   Date: _____

Print Name: _____



# Employee Acknowledgement Form

I hereby acknowledge I have read and received the DTZ Policies and Procedures Manual (the Employee Handbook). I understand it is my responsibility to comply with the policies and procedures contained in this manual and any future revisions. I understand that this edition of the Employee Handbook supersedes all previous oral or written descriptions of the Company's personnel policies and procedures and employee benefits.  I also understand that the benefits that are also described in summary benefit plan descriptions are governed by those descriptions and not the Employee Handbook. The Employee Handbook is not a contract and nothing contained herein should be construed to create a contract of employment or a contract of any kind.

I understand and acknowledge DTZ has the right to modify these policies at the company's sole discretion. It is my responsibility to contact the Human Resources Department if I have any questions regarding the policies and procedures set forth in this manual. I further acknowledge I will have access to the DTZ Policies and Procedures Manual on the company website, and it is my responsibility to review and comply with all policies and procedures and any future electronic or "hard copy" updates.

I understand and agree that I am employed "at will."  I have entered into my employment voluntarily and acknowledge that I have no set term or duration of employment.  Either the Company or I may terminate my employment at any time, with or without cause or notice.

The manual does not negate any collective bargaining agreement terms for union employees.


EMPLOYEE NAME (PRINTED):  _____

EMPLOYEE'S SIGNATURE:  _____

DATE:  _____

EXHIBIT "3"



# U.S. STANDARD SCHEDULE OF COMPENSATION FOR BROKERAGE AND SALES PERSONNEL
EFFECTIVE AS OF JANUARY 1, 2013

This schedule governs the division of commissions and fees on all transactions in the United States between Cushman & Wakefield, Inc. and its affiliates ("C&W") and the brokerage and sales personnel employed by C&W ("broker").  This schedule supersedes the schedules annexed to prior employment agreements and, effective January 1, 2013, supplements and becomes part of all such agreements in the United States.

The term "gross commissions" as used in this schedule means the total commission actually received by C&W, less any outside broker's share of the commission and any charge-backs, off-the-top costs or other expenses deductible in accordance with specific brokerage or agency agreements and the policies and rules of C&W including but not limited to fee sharing and referral guidelines (as may be periodically revised by C&W in its sole discretion).

## I.  SALES AND LEASING COMMISSIONS:

### A.  Basic Commission Division Percentages:
The broker's share of gross commissions when, as and if received by C&W in any calendar year is 50%, subject to the other applicable terms and conditions set forth in this schedule.

### B.  Additional Commission Division Percentages:
The broker can earn an additional share of gross commissions received by C&W in any calendar year, subject to (i) the exclusions set forth in Section I-C below, (ii) C&W's policies and procedures with respect to the timing for payment for any such additional share, and (iii) the terms and conditions as set forth herein, as follows:

1. If gross commissions are more than $500,000 up to and including $700,000, the broker will receive 5% of the gross commissions over $500,000.

2. If gross commissions are more than $700,000 up to and including $900,000, the broker will receive 10% of the gross commissions over $700,000.

3. On gross commissions over $900,000, the broker will receive 15%.

### C.  Exclusive Agency Buildings:

1. Where the agency broker procures a new tenant, the percentages set forth in Sections I-A and I-B hereof shall apply.

2. Where another C&W broker procures a new tenant, the procuring broker shall be compensated in accordance with C&W's customary practice in the local marketplace; provided, however, that, in New York only, if C&W's Strategic Agency Services Group ("SAS") is utilized in such transaction, then, in such event only, the procuring broker shall be compensated in accordance with the percentages set forth in Sections I-A and I-B hereof, and the renting agent shall be compensated at the lesser of (i) 25% of the gross commission or (ii) 50% of the standard override commission for that Exclusive Renting Agency; and, in the case of either (i) or (ii) of this Section I-C(2), the provisions of Section I-B hereof shall not apply to any such commission.

   The percentage rate of gross commissions paid to the agency broker where an outside broker procures a new tenant or where an existing tenant renews or extends its lease, leases additional space or relocates in the building shall, for each individual transaction, be the percentages set forth in I-A and I-B, except in transactions in which SAS is utilized, in which event the provisions of Section I-B hereof shall not apply to any such commission.

### D.  Other Exclusive Agency Assignments:

1. Where the tenant is procured by either the broker who procured the exclusive agency or an outside broker, the percentages set forth in Section I-A and I-B shall apply.

2. Except as hereafter provided, where another C&W broker procures the tenant, the broker will be compensated in accordance with Sections I-A and I-B hereof, and the broker who procured the

tenant and the broker who procured the agency shall jointly determine in good faith how the gross commission shall be allocated between them.

## II.  FEE SHARING GUIDELINES:

### A.  Management Sourced Accounts:

Notwithstanding anything to the contrary contained herein or in the broker's employment or engagement agreement with C&W ("employment agreement"), C&W's then current published Management Sourced Accounts Policy ("MSA Policy") shall govern the gross commissions received by C&W with respect to a "Management Sourced Account" (as defined in the MSA Policy).

### B.  Corporate Occupier & Investor Services:

Notwithstanding anything to the contrary contained herein or in the employment agreement, C&W's then current published Corporate Occupier & Investor Services Fee Sharing Policy ("CIS Policy") shall govern gross commissions received by C&W with respect to a "Corporate Account" (as defined in the CIS Policy).

### C.  Global Fee Sharing Policy:

Notwithstanding anything to the contrary contained herein or in the employment agreement, C&W's then current Global Fee Sharing Policy shall govern commissions splits based on referrals to or from outside the U.S.

### D.  Other Service Lines:

Notwithstanding anything to the contrary contained herein or in the employment agreement, C&W's then current published policies shall govern gross commissions received by C&W with respect to any specific C&W service lines or other specialized areas.  The following fee sharing guidelines are in effect as of January 1, 2013, and may be amended from time to time in updated published policies.

#### i.  Property Management Fees:

A broker who procures a property management agency contract will receive 10% of the property management fees collected by C&W for the first two years of the term of such property management contract only, subject to profitability of the individual account and at C&W's discretion, provided, however, that the broker's right to share in such fees will automatically cease if during such two-year period the broker's employment with C&W terminates for any reason whatsoever, including death.

#### ii.  Appraisal Fees:

A broker who procures an appraisal assignment will receive 10% of the fee collected by C&W on such appraisal assignment.

## III.  BROKERAGE EXPENSES:

A broker is required to pay all expenses in connection with his brokerage activities without reimbursement from C&W, with the following exceptions:

### A.  One-half (1/2) of out-of-pocket travel and lodging expenses (subject to C&W's policies including but not limited to C&W's travel and expense reimbursement policies) will be reimbursed to a broker if, and only if, the reason for the travel and expenses to be incurred has been specifically approved in advance by the Market Leader or Regional President.

### B.  Where an owner or landlord will not pay for advertising expenses and a broker feels that advertising is necessary for the successful marketing of the premises, 50% of any advertising expenses will be reimbursed to the broker if, and only if, the reason for the advertising and the expenditure to be incurred has been specifically approved in advance by the Market Leader or Regional President.

### C.  C&W will pay the application fee and annual renewal fees for all real estate brokers' and salesmen's licenses.

### D.  C&W will absorb 50% of membership dues in a local real estate board for brokers.  Fees for all other organizations are to be paid in full by the broker or the salesman, unless otherwise agreed to by the Market Leader or Regional President.

U.S. STANDARD SCHEDULE OF COMPENSATION FOR BROKERAGE AND SALES PERSONNEL

IV. **ACTIVITY OUTSIDE ASSIGNED OFFICE:**
Brokers and salespersons must obtain the approval of their Market Leader or Regional President prior to engaging in any activities outside the area of their assigned office in accordance with C&W's policy governing such activities.

V. **ADDITIONAL COMMISSION DIVISION PERCENTAGES:**
See Section I-B above.

VI. **ARBITRATION:**
C&W's then current published U.S Internal Commission Dispute Arbitration Policy ("Arbitration Policy") shall govern all disputes between brokers that cannot be resolved by the parties in good faith and where C&W does not elect to exercise its right under the applicable employment/engagement agreements with such brokers to decide such dispute; and such Arbitration Policy shall be deemed incorporated herein and made a part hereof.

VII. **TERMINATION OF BROKER'S EMPLOYMENT:**

A. Subsequent to the termination of the broker's employment with C&W, the broker shall be entitled to share in any commissions or fees collected by C&W in accordance with the terms of the employment agreement; provided, however, that upon the termination of the broker's employment with C&W for any reason whatsoever, the broker's share of leasing commissions on transactions consummated (as defined in paragraph 9(b) of the employment agreement), that are payable over the terms of the lease and conditioned upon the tenant's obligation to pay rent may be reduced by any amount up to twenty percent (20%) of the broker's original share of the gross leasing commission that would have otherwise been payable to the broker pursuant to the terms of this schedule, if the administrative expenses in collecting such commissions warrant such reduction in the reasonable judgment of C&W.

B. Notwithstanding anything to the contrary contained in this schedule, broker shall not, subsequent to the termination of broker's employment, be entitled, pursuant to Section I-B, above or otherwise, to any additional share of gross commissions received by C&W except where such termination is pursuant to an "approved retirement". As used herein, an "approved retirement" is where (a) broker (i) elects to retire from the real estate brokerage industry at the end of his employment with C&W and (ii) represents to C&W in writing that broker has no intention of accepting a position with a competitor of C&W and (b) C&W's CEO of the Americas has approved such status in writing.

VIII. **REVENUE TRANSMITTAL DOCUMENTS:**
Brokers shall complete a Revenue Transmittal Document or similar documentation as required by C&W in its sole discretion (an "RTD") for any transaction generating a commission. Any such RTD shall be completed and submitted by broker to C&W in a timely manner. In the event that broker submits any RTD more than sixty (60) days after the subject transaction closes, then the revenue generated by the subject transaction shall not be considered as "gross commissions" for the purpose of determining a broker's additional commission percentage in accordance with Section I-B, above, or, if the broker does not qualify for any such additional commission percentage or if Section I-B hereof is inapplicable to such broker, then broker's portion of the commission on the subject transaction shall be reduced by ten (10%) percent.

IX. **SECTION 409A COMPLIANCE:**
C&W maintains a written policy with respect to C&W and its employees and independent contractors paying taxes in the United States to comply with Section 409A of the Internal Revenue Code of 1986, as amended ("Section 409A") and, notwithstanding anything to the contrary contained herein or in the employment agreement, such then current published Section 409A Compliance Policy shall govern with respect thereto. Notwithstanding anything herein to the contrary, no amendment may be made to the agreement or this schedule if it would cause the agreement, this schedule or any payment under either to not be in compliance with Section 409A.

**EXHIBIT "4"**

| SGB Bonus Calculations | | | | |
|---|---|---|---|---|
| A | B | C | D | E |
| Year | Total Gross Collected Commissions | SGB Bonus 10.0% (10% X B) | Less: SGB Salary (C-D) | SGB Net Bonus (C-D) |
| 2016 | $287,804 | $28,780 | $200,000 | $0 |
| 2017 | $341,219 | $34,122 | $203,600 | $0 |
| 2018 | $2,454,523 | $245,452 | $204,800 | $40,652 |
| Total | $3,083,547 | | $608,400 | $40,652 |

| SGB 2018 Bonus | RC & KG | Total |
|---|---|---|
| 2018 Bonus | $20,326 | $40,652 |
| Special Discretionary Bonus | $14,674 | $29,348 |
| Total | $35,000 | $70,000 |

**Footnotes:**

1. SGB Salary has been revised to reflect actual direct salary paid in each year.
2. Raul Campos & Ken Gilbert each owe the bonus amount in column D13:14 above.

| Compensation Comparison Matrix | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| A | B | C | D | E | F | G | H | I | J | K | L |
| Year | Total Gross Collected Commissions | KG Portion or RC Portion Individually | | | | | | SGB Compensation | | | |
| | | KG or RC Collected Commissions | KG or RC Paid Commissions | SGB-OLY Expenses | Travel Expenses | Paid Commissions (D-E-F) | Net % Collected (G/B) | Salary | Bonus | Total Comp (I+J) | Comp % (K/B) |
| 2016 | $287,804 | $143,902 | $0 | $93,750 | $20,000 | ($113,750) | | $200,000 | $0 | $200,000 | 69.5% |
| 2017 | $341,219 | $170,610 | $107,000 | $50,900 | $25,000 | $31,100 | 9.1% | $203,600 | $0 | $203,600 | 59.7% |
| 2018 | $2,454,523 | $1,227,262 | $692,718 | $51,200 | $25,000 | $616,518 | 25.1% | $204,800 | $70,000 | $274,800 | 11.2% |
| Total | $3,083,547 | $1,541,773 | $799,718 | $195,850 | $70,000 | $533,868 | 17.3% | $608,400 | $70,000 | $678,400 | 22.0% |

**EXHIBIT "5"**

**Deadline Approaching** - Pepperdine's online Master of Legal Studies program:



# Shane Smith · 3rd

Senior Associate | Tenant
Representation

San Francisco Bay Area · Contact info

**452** connections

🔒 Message    More

 **Cushman & Wakefield**

 **Southern Methodist
University**

---

## Get the LinkedIn app and see more profiles like Shane's anytime, anywhere

✕

| mlucygoodnough@gmail.com |

Shane Smith
Senior Associate ...

**Or send me an SMS instead**

---

## About

I see myself as a life long learner, consistently trying to understand the market at

large, and how different sectors operate and thrive. In a world that is endlessly
shifting, my goal is to understand the seemingly infinite formulas for ... see more

## Activity

451 followers

Posts Shane created, shared, or commented on in the last 90 days are displayed
here.

See all activity

## Experience



**Senior Associate**
Cushman & Wakefield
Aug 2018 – Present · 3 yrs 2 mos
San Francisco Bay Area

Global transaction management lead and large-scale strategy
for corporate real estate accounts.

Currently I am acting as the lead Transaction Manager for

   
Home    My Network

 **Shane Smith**
Senior Associate | Tenant Representation

More    🔒 Message

**Strategic Consulting Intern**
Cushman & Wakefield
Jan 2018 – May 2018 · 5 mos
Dallas/Fort Worth Area



### Strategic Consulting Intern
Cushman & Wakefield
Jun 2017 – Aug 2017 · 3 mos
San Francisco, CA

Worked one-on-one with a broker focusing on strategic
thinking and analysis. Some of my tasks included:
- Basic research of client strategic objectives, organizational
structure, operational initiatives, and general finar ... see more



### Sales Associate
Marine Layer
Jan 2017 – May 2017 · 5 mos
Dallas/Fort Worth Area

Worked as a sales associate in the newly opened Dallas
Marine Layer location. In addition to this, as the first employee
hired I also assisted in preparing the store for opening.
Day to day tasks included:                        ... see more



### Camp Counselor
Mount Hermon Association, Inc.
Jun 2016 – Aug 2016 · 3 mos
Santa Cruz, California

Show 3 more experiences ⌄

## Education



### Southern Methodist University
Bachelor of Arts - BA, Corporate Communications and Public
Affairs; BA, Film
2014 – 2018



### De La Salle High School
2010 – 2014

## Volunteer experience

### Cushman Wakefield Future Leaders (CWFL) Bay Area Co-Chair

Cushman & Wakefield

Jan 2019 – Present  · 2 yrs 9 mos

Co-Lead the Bay Area chapter of Cushman & Wakefield Future Leaders



### Small Group Leader

KLIFE Ministries

Aug 2015 – May 2018  · 2 yrs 10 mos

Lead a small group of 10th grade students, in addition to assisting with high school activities, acting in and creating skits, and developing program material for the organization.

## Skills & endorsements

**Strategic Data Analysis** · 2

 Endorsed by **2 of Shane's colleagues at Cushman & Wakefield**

**Transaction Management** · 2

 Endorsed by **2 of Shane's colleagues at Cushman & Wakefield**

**Portfolio Management** · 2

Endorsed by **2 of Shane's colleagues at Cushman & Wakefield**

Show more ⌄





Ad  •••

 

Lucy, explore jobs at **Cushman &
Wakefield** that match your skills

**wakefield** that match your skills

See jobs

## People also viewed

**DeShontae M.** • 3rd+
Senior Portfolio Lease Analyst at Cushman & Wakefield

Message



**Spencer Hughes** • 3rd
Self-Employed

Message



**Ray Devlin** • 3rd
Director at Cushman & Wakefield

Message

**fredrick mason** • 3rd+
Shipping and Receiving Clerk at Cushman & Wakefield

Message



**Stephanie Rudolph** • 3rd
Brokerage Coordinator at Cushman & Wakefield

Message

Show more ⌄

## People you may know



**Kim Zapata**

Senior Complex Business and IP Litigation Attorney at Computerlaw Group LLP

Connect



**Arpita Das**

Licensed Foreign Attorney with LL.M, UC Berkeley, School of Law, CA

Connect



**Christie Dudley**

Attorney in High Tech

Connect



**Kathryn Brooks**

Executive Assistant at Computerlaw Group LLP

Connect



**Maz Shakernia**

Lead IP Counsel, Copyright at Facebook

Connect

Show more ⌄

 **LEARNING**

Add new skills with these courses



**Virtual Investing in Real Estate**

2,021 viewers



**Real Estate Deal Structuring: Introduction to the Waterfall Framework**

91,597 viewers

 **Analyzing a Real Estate Deal**

3,485 viewers

**Show more on LinkedIn Learning**

Promoted    •••



UC Berkeley Haas Flex MBA

Earn a Top-Ranked MBA from Berkekley Haas without the commute.

Learn more



Need more legal clients?

Get more leads while saving time with Avvo Elite. Grow your firm. See how.

Learn more